UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
ANDREW GREENE,

                                      Case No. 2:14-cv-01044-JS-WDW

                    Plaintiff,


       -against-


PARAMOUNT PICTURES CORPORATION, a
Delaware corporation; RED GRANITE PICTURES,
INC., a California corporation; APPIAN WAY, LLC, a
California limited liability company; SIKELIA
PRODUCTIONS, INC., a Delaware corporation; and
JOHN AND JANE DOES 1 THROUGH 10

                    Defendants.

----------------------------------------------------------------X


## MEMORANDUM OF LAW IN SUPPORT OF
## <u>DEFENDANTS' MOTION TO DISMISS</u>

KATHERINE M. BOLGER
RACHEL F. STROM
LEVINE SULLIVAN KOCH & SCHULZ, LLP
321 West 44th Street, Suite 1000
New York, NY 10036
212-850-6123
Fax: 212-850-6299
Email: kbolger@lskslaw.com

LOUIS P. PETRICH (admitted *pro hac vice*)
LEOPOLD, PETRICH & SMITH, P.C.
2049 Century Park East, Suite 3110
Los Angeles, California 90067-3274
Telephone:  (310) 277-3333
Facsimile:  (310) 277-7444
Email:  lpetrich@lpsla.com

*Attorneys for Defendants*
*Paramount Pictures Corporation*
*and Red Granite Pictures, Inc.*

## **TABLE OF CONTENTS**

                                                                                          Page

I.      PRELIMINARY STATEMENT ....................................................................................1

II.     FACTS ..........................................................................................................................2

III.    THE RULE 12(b)(6) STANDARD OF REVIEW......................................................5

IV.     PLAINTIFF'S FIRST CLAIM, ALLEGING VIOLATION OF NEW YORK
        CIVIL RIGHTS LAW SECTIONS 50 AND 51, MUST BE DISMISSED .......................6

        **A.**      No use of name, portrait or picture. ........................................................7

        **B.**      The Film did not make use of Plaintiff's name, portrait or picture for
                  purposes of advertising or trade.............................................................10

V.      COUNTS TWO AND THREE OF THE COMPLAINT PURPORT TO
        STATE COMMON LAW CLAIMS FOR INVASION OF PRIVACY; NEW
        YORK DOES NOT RECOGNIZE SUCH CLAIMS ........................................14

VI.     THE FOURTH CLAIM, FOR LIBEL, MUST BE DISMISSED BECAUSE
        THE FILM'S PORTRAYAL OF NICKY KOSKOFF IS NOT "OF AND
        CONCERNING" ANDREW GREENE ........................................................14

VII.    THE FIFTH COUNT, ALLEGING LIBEL PER SE ON A THEORY OF
        NEGLIGENCE, MUST BE DISMISSED ........................................................16

VIII.   CONCLUSION........................................................................................................19

<u>TABLE OF AUTHORITIES</u>

**Page(s)**

<u>Federal Cases</u>

*Allen v. Nat'l Video, Inc.*,
    610 F.Supp. 612 (S.D.N.Y. 1985) ...............................................................7, 8

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .................................................................................5, 6

*Brass v. Am. Film Tech., Inc.*,
    987 F.2d 142 (2d Cir. 1993) ........................................................................6

*Burck v. Mars, Inc.*,
    571 F.Supp.2d 446 (S.D.N.Y. 2008).................................................7, 8, 10, 14

*Cerasani v. Sony Corporation*,
    991 F.Supp. 343 (S.D.N.Y. 1998) ............................................................15, 16

*Chambers v. Time Warner, Inc.*,
    282 F.3d 147 (2d Cir. 2002).........................................................................6

*Church of Scientology Intern. v. Time Warner, Inc.*,
    806 F.Supp. 1157 (S.D.N.Y. 1992) .............................................................14

*Davis v. Costa-Gavras*,
    654 F.Supp.653 (S.D.N.Y. 1987) ............................................................15, 16

*Diaz v. NBC Universal, Inc.*,
    536 F.Supp.2d 337 (S.D.N.Y. 2008).............................................................14

*Groden v. Random House, Inc.*,
    61 F.3d 1045 (2d Cir. 1995).......................................................................14

*Harding v. Paramount Pictures*,
    2013 WL 174401 *report accepted* 2013 WL1285243 (S.D.N.Y. 2013) ...........................9

*Hoepker v. Kruger*,
    200 F.Supp.2d 340 (S.D.N.Y. 2002)..............................................................7

*Konikoff v. Prudential Ins. Co. of Am.*,
    234 F.3d 92 (2d Cir. 2000).....................................................................17, 18

*Lan Sang v. Ming Hai*,
    951 F.Supp.2d 504 (S.D.N.Y. 2013)............................................................14

*Lohan v. Perez*,
  924 F.Supp.2d 447 (E.D.N.Y. 2013) ........................................................................10

*Man v. Warner Bros. Inc.*,
  317 F. Supp. 50 (S.D.N.Y. 1970) ..............................................................................11

*Post v. Regan*,
  677 F. Supp. 203 (S.D.N.Y. 1988), *aff'd*, 854 F.2d 1315 (2d Cir. 1988) ..........................17

*Sanders v. Gardner*,
  7 F.Supp.2d 151 (E.D.N.Y. 1998) .........................................................................2, 6

*Treppel v. Biovail Corp.*,
  233 F.R.D. 363 (S.D.N.Y. 2006) ..............................................................................17

**State Cases**

*Cassini v. Advance Publications, Inc.*,
  977 N.Y.S.2d 665, 41 Misc.3d 1202(A) (Sup. Ct. N.Y. Cnty Apr 15, 2013)
  ....................................................................................................................19

*Chapadeau v. Utica-Observer-Dispatch, Inc.*,
  38 N.Y.2d 196, 341 N.E.2d 569 N.Y.2d 61 (1975) ................................................16, 18

*Costanza v. Seinfeld*,
  279 A.D.2d 255, 719 N.Y.S.2d 29 (1st Dep't 2001) ..................................................11

*Cottom v. Meredith Corp.*,
  65 A.D.2d 165 (4th Dep't 1978) ..............................................................................17

*De Gregorio v. CBS, Inc.*,
  123 Misc. 2d 491, 473 N.Y.S.2d 922 (Sup. Ct. N.Y. Cnty. 1984) ................................12

*Delan v. CBS, Inc.*,
  91 A.D.2d 255, 458 N.Y.S.2d 608 (2d Dep't 1983) ..................................................11

*Frank v. Nat'l Broad. Co.*,
  119 A.D.2d 252, 506 N.Y..2d 869 (2d Dep't 1986) ..................................................11

*Gaeta v. Home Box Office*,
  169 Misc. 2d 500, 645 N.Y.S.2d 707 (Civ. Ct. N.Y. Co. 1996).....................................13

*Gaeta v. N.Y. News Inc.*,
  62 N.Y.2d 340 (1984) ............................................................................................17

*Hampton v. Guare*,
  195 A.D.2d 366, 600 N.Y.S.2d 57 (1st Dep't 1993) ...............................................8, 11

*Huggins v. Moore*,
    94 N.Y.2d 296 (1999) ................................................................................12, 17

*Messenger ex. rel. Messenger v. Gruner + Jahr Printing & Publ'g.*,
    94 NY.2d 436, 706 N.Y.2d 52, 727 N.E.2d 549 (2000)................................6, 12

*Krupnik v. NBC Universal, Inc.*,
    37 Misc. 3d 1219(A), 2010 WL 9013658 (Sup. Ct. N.Y. Cnty. June 29,
    2010) ............................................................................................................11

*Lemerond v. Twentieth Century Fox Film Corp.*,
    No. 07 Civ. 4635 (LAP), 2008 WL 918579 (S.D.N.Y. Mar. 31, 2008) ....................11, 13

*Lombardo v. Doyle, Dane & Bernbach, Inc.*,
    58 A.D.2d 620, 396 N.Y..2d 661 (2d Dep't 1997) ..........................................8

*Posner v. Lewis*,
    18 N.Y.2d 566, 965 N.E.2d 949, 942 N.Y.2d 447 (2012) ..............................18

*Sarwer v. Conde Nast Publications, Inc.*,
    237 A.D.2d 191, 654 N.Y.S.2d 768 (1st 1997) ..............................................18

*Stephano v. News Group Publ'ns Inc.*,
    64 N.Y.2d 174, 485 N.Y.S.2d 220 (1984) ......................................................10

*Walter v. NBC Television Network, Inc.*,
    27 A.D.3d 1069, 811 N.Y.2d 521, 523 (4th Dep't 2006) .................................7

*Waters v. Moore*,
    70 Misc.2d 372, 334 N.Y.S.2d 428 (N.Y.Sup.Ct. 1972) .................................9

*Wojtowicz v. Delacorte Press*,
    58 A.D.2d 45, 395 N.Y.S.2d 205 (1st Dep't 1977), *aff'd* 43 N.Y.2d 858,
    403 N.Y.S.2d 218, 373 N.E.2d 129 (1978)......................................................9

**Federal Statutes/Rules**

Fed.R.Civ.P. 12(b)(6)................................................................... *passim*

**State Statutes**

New York Civil Rights Law, Sections 50 and 51 .......................................... *passim*

Paramount Pictures Corporation and Red Granite Pictures (collectively, "Defendants") respectfully submit this Memorandum of Law in support of their Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6).

## I.    PRELIMINARY STATEMENT

Plaintiff Andrew Greene, an inactive member of the State Bar of California, whose application is currently pending for admission to the bar of the State of New York, brings this action for invasion of privacy and defamation in connection with the Film *The Wolf of Wall Street* ("the Film").  The Film is a dramatization inspired by true events surrounding the hundreds of millions of dollars of securities fraud perpetrated by a company called Stratton Oakmont.  As explained in the Film's credits, the Film employed composite characters to tell the story of the antiheroic protagonist, Jordan Belfort.  As this Memorandum will show, Greene was an attorney intimately involved in the pervasive fraud and corruption that characterized the Stratton Oakmont securities operation in the 1990s, who now alleges in this action that the depiction of the composite character "Nicky Koskoff," aka "Rugrat," in the Film based upon the 2007 book *The Wolf of Wall Street* ("the Book") (1) constitutes a violation of Sections 50 and 51 of the Civil Rights Law of the State of New York; (2) constitutes a violation of his common law right to privacy; (3) constitutes a violation of his "common law propriety [sic] right" to exclusive control of the commercial use of his image, likeness and characterization; and (4) is libel per se in that it portrays him as "a criminal and drug user with misogynistic tendencies" either with actual malice (fourth claim) or negligence (fifth claim).

This Memorandum will demonstrate that Plaintiff's first claim, for violation of Civil Rights Laws 50 and 51, must be dismissed because, not only did the Film fail to use Plaintiff's name or likeness, the Film itself is categorically immune because it is the free speech interests in a dramatic motion picture outweigh his statutory privacy rights.  Plaintiff's second and third

claims for relief, asserting common law claims for privacy, must be dismissed for the additional reason that common law privacy claims are not recognized under the law of the State of New York.  Plaintiff's fourth and fifth claims, alleging libel per se under theories of either actual malice or negligence, must be dismissed because no plausible libel claim can be stated because no substantial number of reasonable viewers of the Film could conclude that the character of "Rugrat" in the motion picture was a depiction of Plaintiff.[1]  The viewers who had read the underlying Book would know that the Book described two financial executives affiliated with Stratton Oakmont who used ridiculous hairpieces.  The readers of the Book would readily see that the "Rugrat" character was a composite.  The people who had not read the Book had no basis to associate the "Rugrat" character with Greene.

## II.    FACTS

Plaintiff describes himself as "an inactive member of the State Bar of California and at one-time, the head of Stratton Oakmont, Inc.'s corporate finance department."  Cpt. ¶1.  He alleges that he also served on Stratton Oakmont's board of directors, and was associated with the brokerage firm from 1993 until his resignation in 1996.  Cpt. ¶18.  He alleges that, at all times relevant hereto, he "frequently wore a toupee."  Cpt. ¶27.  In fact, Mr. Greene is no stranger to this court.  He was one of the petitioners in *Sanders v. Gardner*, 7 F.Supp.2d 151 (E.D.N.Y. 1998) (Seybert, J.).  In that action, Greene unsuccessfully petitioned to set aside an arbitration award holding him personally liable for $2.18 million in compensatory and punitive damages stemming from securities fraud (the same activities depicted in the Film).  In rejecting his petition, this Court noted:

Greene commenced his employment at Stratton [in 1993] as a holder of five securities

---

[1] The Fifth Claim also is subject to dismissal because the Film deals with a matter of legitimate public concern, and liability for defamation thus requires pleadings and proof of gross irresponsibility.  *See* Section VII, *infra*.

licenses, a Juris Doctor degree, and approximately four years' experience in the securities field.  Meanwhile, by March of 1993, Stratton's exploits were renowned throughout the industry.  Unfortunately, this classic "boiler room" operation was still an unknown commodity for Dr. Gardner and numerous other unsuspecting investors.  Greene, however, cannot profess a similar naiveté . . . Greene was aware of the ongoing investigations and consent decrees to which Stratton was a party.  As one of Stratton's three members of the Board of Directors, Greene's purported ignorance of the inner workings of this brokerage house could easily have been perceived by the Arbitrators as an unabashed mendacity.  This is especially so because Greene was personally involved in the underwriting of new issues and Stratton was repeatedly criticized for its profit margins and control of the market for these stocks.  Moreover, actual control requires only ability to direct the actions of the controlled person, and not the actual exercise thereof.

*Id*. at 163.

Mr. Greene complains in this action (rather disingenuously) that the character of Nicky Koskoff, aka "Rugrat," in the Film *The Wolf of Wall Street* damaged him because "the character . . . is portrayed participating in activities that are improper, unprofessional and unethical."  Cpt. ¶1.

The Complaint references both the Book, *The Wolf of Wall Street* (2007), and the 2013 Film of which Plaintiff complains.  A comparison of those works demonstrates that the Nicky Koskoff character was not a portrayal of Plaintiff, but was instead a composite of several people associated with Stratton Oakmont as expressly stated prominently in the Film's closing credits at 2:59:30:

"While this story is based on actual events, certain characters, characterizations, incidents, locations and dialogue were fictionalized or invented for purposes of dramatization.  With respect to such fictionalization or invention, any similarity to the name or to the actual character or history of any person, living or dead, or any product or entity or actual incident, is entirely for dramatic purpose and not intended to reflect on an actual character, history, product or entity."

In contrast to the Film, the Book contains numerous details regarding Plaintiff, explicitly using his name, Andrew Greene, and/or his nickname, "Wigwam."  Greene is described as a trusted childhood friend of Jordan Belfort with "the worst toupee this side of the Iron Curtain."

3

Book, p. 65.  He is described as someone who, as a teenager, smoked thousands of marijuana

joints, *Id.*, p.66, before he:

> ". . . managed to get caught cheating on his SATs, which forced him into exile to the
> little town of Fredonia in upstate New York . . . at . . . Fredonia State University.  But
> he did manage to negotiate his way through the vigorous academic demands of that
> fine institution and graduate five and a half years later—not one ounce smarter, yet a
> good deal frumpier.  From there he finagled his way into some Micky Mouse law
> school in Southern California—earning a diploma that held about as much legal
> weight as one you'd receive from a Cracker Jack box.
> So when Andrew Todd Greene, alias Wigwam, caught wind of the dramatic success
> that had rained down on his childhood friend, he followed in the footsteps of the rest
> of my childhood friends and sought me out, swore undying loyalty to me, and hopped
> on the gravy train.  That was a little over a year ago.  Since then, in typical Stratton
> fashion, he'd undermined and backstabbed and manipulated and cajoled and squeezed
> out anyone who stood in his way, until he Peter-Principled himself all the way to the
> very top of the Stratton food chain."

*Id.*, p. 66.

Belfort describes Plaintiff advising him on a planned event in the Stratton Oakmont

boardroom by which the boiler room brokers would toss midgets.  *Id.*, p. 65.  It describes

Plaintiff as an escrow agent knowingly participating in a criminal conspiracy to hide Belfort's

illegal ownership of Steve Madden shares in which Stratton Oakmont was also making a market.

Id., p. 74-75, 274, 416-418, 434-35.  Greene is described as a potential courier for 40 Quaalude

tablets to be delivered to Belfort, *id.*, p. 221, and when regulators start to zero in on Stratton

Oakmont, Greene is quoted as an advocate for the strategy of "cockroaching," a scheme by

which Stratton Oakmont would be nominally closed down, but effectively reopen with the same

people as part of multiple smaller firms that would evade the SEC so that, as Greene states, they

"could be in business by the end of the year."  *Id.*, p. 364-65.  Belfort describes Plaintiff as a

"shyster lawyer," *id.*, p. 418, a "toupeed motherfucker," *id.*, and someone who, when it came to

the securities industry, was basically "an amateur."  *Id.*, p. 434.  Belfort lists Plaintiff as one of

the people with whom he gradually lost touch because "[t]he gravy train had officially stopped

running, and the drugs, which had been the glue, were no longer there to hold us together." *Id.*, p. 509. At the end of the Book, when he summarizes the criminal sanctions against his various co-conspirators, he describes Plaintiff as someone who "got away with it." *Id.*, p.519.

But the Book did not have only one dishonest executive with a notable toupee. The Book portrays "self-proclaimed Swiss-banking expert Gary Kaminsky" as the Chief Financial Officer of Dollar Time Group, a publicly traded company of which Stratton Oakmont's Jordan Belfort was the largest shareholder. Kaminsky has "a ridiculous salt-and-pepper toupee that was an entirely different color than his sideburns, which were ink black—apparently dyed that way by a colorist with a good sense of humor." Book, p. 121. Kaminsky organizes a trip by Belfort to Switzerland as part of a money laundering scheme. *Id.* Ultimately, Kaminsky is indicted and jailed in Miami, together with the Swiss banker who was the center of the money laundering scheme. *Id.*, p. 339.

The Film portrays Nicky "Rugrat" Koskoff as a childhood friend of Belfort, hired as a salesman at Stratton Oakmont, who moves into a position of significant responsibility, who participates in the general debauchery of the workplace, and who is instrumental in arranging for the contact with the Swiss banker for the money laundering scheme, eventuating in "Nicky's" arrest in Miami, along with the Swiss banker.

The readers of the Book who see the Film can see that the character of "Nicky" is a composite of several characters. Those who watch the Film, without having read the Book, have no basis to associate Plaintiff with the character of "Nicky."

## III.    THE RULE 12(B)(6) STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion to dismiss, the complaint must "state a claim for relief that is plausible on its face," which requires pleading "factual content that allows the court to draw the reasonable inference that the defendant is liable for the conduct alleged." *Ashcroft v.*

*Iqbal,* 556 U.S. 662, 678 (2009).  "'[L]abels and conclusions' or 'a formulaic recitation of the

elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v.*

*Twombly*, 550 U.S. 544, 555 (2007)).  In reviewing a Rule 12(b)(6) motion, the court may refer

to "documents attached to the complaint as an exhibit or incorporated in it by reference, to

matters of which judicial notice may be taken, or to documents . . . of which [the plaintiff] had

knowledge and relied on in bringing the suit," *Brass v. Am. Film Tech., Inc.*, 987 F.2d 142, 150

(2d Cir. 1993).  Even where a document is not incorporated by reference, the court may consider

it where the complaint "relies heavily upon its terms and effect." *Chambers v. Time Warner, Inc.*,

282 F.3d 147, 153 (2d Cir. 2002).

     Here, moving parties rely not only upon the Complaint, but also upon the Book,

McFarland Decl., Ex. 1, the Film, McFarland Decl., Ex. 2, and this Court's opinion in *Sanders v.*

*Gardner, supra*.

## IV. PLAINTIFF'S FIRST CLAIM, ALLEGING VIOLATION OF NEW YORK CIVIL RIGHTS LAW SECTIONS 50 AND 51, MUST BE DISMISSED

     New York Civil Rights Law Sections 50 and 51 "provide a limited statutory right of

privacy."  *Messenger ex. rel. Messenger v. Gruner + Jahr Printing & Publ'g.*, 94 NY.2d 436,

441, 706 N.Y.2d 52, 727 N.E.2d 549 (2000).  Section 50 of the Civil Rights Law prohibits the

"use [ ] for advertising purposes, or for the purposes of trade, the name, portrait or picture of any

living person without having first obtained the written consent of such person . . . ."  NY Civ.

Rights Law §50 (McKinney 2012).  Section 51 provides:

> Any person whose name, portrait, picture or voice is used within this state for
> advertising purposes or for the purposes of trade without the written consent first
> obtained as above provided [in §50] may maintain an equitable action in the supreme
> court of this state against the person, firm, or corporation so using his name, portrait,
> picture or voice, to prevent and restrain the use thereof; and may also sue and recover
> damages for any injuries sustained by reason of such use and if the defendant shall have
> knowingly used such person's name, portrait, picture or voice in such manner as is
> forbidden or declared to be unlawful by Section Fifty of this Article, the jury, in its

discretion, may award exemplary damages . . . ."

"To maintain a civil action under Section 51, a plaintiff must show that the defendant (1) used his name, portrait, picture, or voice, (2) for advertising or trade purposes, (3) without his written consent." *Burck v. Mars, Inc*., 571 F.Supp.2d 446, 451 (S.D.N.Y. 2008). *See Hoepker v. Kruger*, 200 F.Supp.2d 340, 348 (S.D.N.Y. 2002) (quoting *Titan Sports, Inc. v. Comics World Corp*., 870 F.2d 85, 87 (2d Cir. 1989).

Plaintiff's statutory privacy right claim fails because he cannot prove either that Defendants' Film made any use of his name, portrait, picture, or voice, or that the use was made for advertising purposes or for the purposes of trade.

### A.   No use of name, portrait or picture.

Plaintiff does not claim that his <u>name</u> was used by Defendants.  What he claims is that the character Nicky Koskoff, aka "Rugrat," had enough similarity to his personal attributes to qualify as a "portrait or picture."  But the case law surrounding the "portrait or picture" element reflects the fact that "Sections 50 and 51 are 'to be narrowly construed' and 'strictly limited to non-consensual commercial appropriations of the name, portrait, or picture of a living person.'" *Walter v. NBC Television Network, Inc*., 27 A.D.3d 1069, 1070, 811 N.Y.2d 521, 523 (4th Dep't 2006).  The cases require that Plaintiff prove that Defendants used a "recognizable likeness," *Allen v. Nat'l Video, Inc*., 610 F.Supp. 612, 622 (S.D.N.Y. 1985) (Motley, D.J.).  *Allen* involved the use in an advertisement of a Woody Allen lookalike.  Judge Motley declined to apply Section 51, finding that only a "somewhat strained construction" of the statute would allow recovery because, in order to prevail, plaintiff would have to show that "the mixture of fantasy and reality [in the advertisement] suggested almost unavoidably the actual presence of the real-life celebrity" and that "the photograph in question . . . create[d], as a matter of law, the illusion of Woody Allen's actual presence in the advertisement. *Id*. at 623-24.  The rejection of the Section

7

51 claim in *Allen* flowed from the fact that "[t]he privacy law does not prohibit one from evoking certain aspects of another's personality." *Id*. at 623 (citing *Lombardo v. Doyle, Dane & Bernbach, Inc*., 58 A.D.2d 620, 396 N.Y..2d 661 (2d Dep't 1997). Judge Motley concluded that "[m]erely suggesting certain characteristics of the plaintiff, without literally using his or her name, portrait or picture, is not actionable under the statute." 610 F.Supp. at 621. Judge Motley relied on *Lombardo*, which also rejected a claim under Section 51, finding that an actor conducting a band playing *Auld Lang Syne* at a New Year's Eve party in the manner of Guy Lombardo, had not made a commercial use of the name, portrait or picture of Guy Lombardo.

In *Burck v. Mars, Inc., supra*, Judge Chin granted a motion for judgment on the pleadings (using the same standards applicable to Rule 12(b)(6) motions) and dismissed the plaintiff's street entertainer's claim that his "Naked Cowboy" persona had been used for commercial purposes by the defendant candy manufacturer which had dressed a blue "M&M precisely like the plaintiff's costume—white underwear, white cowboy hat, white cowboy boots and white guitar." The court found that defendant's use was not a "recognizable likeness or representation" of plaintiff because no viewer would have thought that the cowboy character was actually plaintiff or was intended to be plaintiff, and that although defendants did evoke certain aspects of the character created by plaintiff and copied the character's costume, those actions were not prohibited by Sections 50 and 51. The court concluded that defendants' character were not actionable because they were ". . . merely personifications that do not fall within the literal meaning of 'portrait' or 'picture' of a person." 571 F.Supp.2d at 452-453. *See Hampton v. Guare*, 195 A.D.2d 366, 600 N.Y.S.2d 57 (1st Dep't 1993) (con man who inspired play "Six Degrees of Separation" cannot maintain action under Civil Rights Law); *Wojtowicz v. Delacorte Press*, 58 A.D.2d 45, 395 N.Y.S.2d 205, 207 (1st Dep't 1977) (depiction of plaintiffs under

fictitious names in film "Dog Day Afternoon" fails to state a claim under §51), *aff'd* 43 N.Y.2d

858, 403 N.Y.S.2d 218, 374 N.E.2d 129 (Ct.App. 1978); *Waters v. Moore*, 70 Misc.2d 372, 334

N.Y.S.2d 428, 433 (N.Y.Sup.Ct. 1972) (depiction of plaintiff's character under a fictitious name

in film "The French Connection" fails to state a §51 claim, regardless of whether plaintiff's

"identity can be ascertained from his involvement with the actual event [depicted in the film] or

by reference to external sources).

More recently, in *Harding v. Paramount Pictures*, 2013 WL 174401, *report accepted,*

2013 WL 1285243 (S.D.N.Y. 2013), the court granted the defendant's motion to dismiss the

claim that a videogame based on the *Warriors* film had made a use of plaintiff's likeness from

the film, based upon the simple fact that there was no resemblance between plaintiff as he

appeared in the film and the videogame character that he claimed was based on a picture of him

in the *Warriors* film.  The Nicky Koskoff character in the Film does not use either the name or

likeness of Plaintiff.  The mere fact that the character is a financial executive for Stratton

Oakmont with an unattractive hairpiece does not convey the message that Koskoff "is" Plaintiff.

In fact, the underlying book refers to another financial executive associated with Stratton

Oakmont who also has an unattractive hairpiece, named Gary Kaminsky, Book, p. 121.  In the

Book, it is Kaminsky who introduces Belfort to the Swiss banker, and it is Kaminsky who is

arrested with the Swiss banker in Miami, Book, p 339.  This of course is the inspiration for the

portion of the Film that describes "Nicky Koskoff" arrested in Miami with the Swiss banker.

Given the Book's portrayal of more than one character with a notable hairpiece who engages in

acts similar to those of "Nicky," and the Film's express use of composite characters, no

reasonable fact finder could claim that "Nicky" was a recognizable likeness of Andrew Greene.

**B.**   **The Film did not make use of Plaintiff's name, portrait or picture for purposes of advertising or trade.**

The fact that the Film was distributed and otherwise licensed for profit is insufficient to establish that the characters and images contained in the Film were used for "purposes of trade" of "advertising" within the meaning of the New York Civil Rights Law.  As Judge Chin pointed out in *Burck v. Mars, Inc., supra,* 571 F.Supp.2d at 451:

> "Sections 50 and 51 are limited in their reach because of the First Amendment.  They do not apply, for example, to 'reports of newsworthy events or matters of public interest,' *Messenger v. Gruner + Jahr Printing & Publ'g* (citation omitted).  Likewise, they do not apply to works of art.  *Hoepker v. Kruger*, 200 F.Supp.2d 340, 349 (S.D.N.Y. 2002).  For example, the use of a town justice's picture without his permission was held not to violate Section 50 where it was used as part of a painting that was a caricature and parody.  *Altdach v. Kulon*, 302 A.D.2d 655, 657, 754 N.Y..2d 709 (3d Dep't 2003).  Similarly, 'entertainment broadcasts' that involve, for example, humor and comedy are forms of expression that may also be protected by the First Amendment, although not categorically.  *See Geary v. Goldstein*, 831 F.Supp.269, 273 (S.D.N.Y. 1993) (quoting *Frank v. Nat'l Broad. Co.*, 119 A.D.2d 252, 257, 506 N.Y..2d 869 (2d Dep't 1986))."

As Judge Hurley recently pointed out in *Lohan v. Perez*, 924 F.Supp.2d 447 (E.D.N.Y. 2013), 'that books, newspapers and magazines are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment.' (quoting *Time, Inc. v. Hill*, 385 U.S. 374, 397, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967), which in turn was quoting *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501-02, 72 S.Ct. 777, 96 L.Ed. 1098 (1952).)  *See also Stephano v. News Group Publ'ns Inc.,* 64 N.Y.2d 174, 184-85, 485 N.Y.S.2d 220, 225 (1984) (The fact that defendants may have included this item in its column solely or primarily to increase the circulation of its magazine and therefore its profits …does not mean that the defendant has used the plaintiff's picture for trade purposes…. Indeed, most publications seek to increase their circulation and also their profits. It is the content of the article and not the defendant's motive or primary motive to increase circulation which determines whether it is a newsworthy item, as opposed to a trade usage under the Civil Rights Law".); *Man*

*v. Warner Bros. Inc.,* 317 F. Supp. 50, 52 (S.D.N.Y. 1970) ("The mere fact that defendants are spurred by the profit motive and engaged in the commercial exploitation of the motion picture does not negate their right to depict a matter of public interest or to advertise the picture by the showing of a 'trailer' ..."); *Delan v. CBS, Inc.,* 91 A.D.2d 255, 259, 458 N.Y.S.2d 608, 613 (2d Dep't 1983) ("The reporting of matters of public information or of legitimate public interest . . . is a matter of privilege and not within the ambit of the term 'purposes of trade' as used in the Civil Rights Law . . . notwithstanding the inclusion of commercials." (emphasis added) (citations omitted)).

Thus, courts have repeatedly made clear that uses of a person's image or likeness in entertainments, like the one at issue here, *do not* amount to a use for advertising or purposes of trade.  *Frank v. NBC*, 119 A.D.2d 252, 256, 506 N.Y.S.2d 869, 871 (2d Dep't 1986) (dismissing § 51 claim on motion to dismiss because comedy skit allegedly using plaintiff's likeness on "Saturday Night Live" was not for advertising or trade); *Lemerond v. Twentieth Century Fox Film Corp.*,  No. 07 Civ. 4635 (LAP), 2008 WL 918579, at *3 & n.1 (S.D.N.Y. Mar. 31, 2008) (finding use of plaintiff's image in satirical and comedic movie not purely commercial, even though there is a "profit motive"); *Costanza v. Seinfeld*, 279 A.D.2d 255, 255, 719 N.Y.S.2d 29, 30 (1st Dep't 2001) (affirming dismissal of plaintiff's Section 51 claim for misappropriation of his likeness for the "'character of George Costanza' for the Seinfeld television program" because "works of fiction do not fall within the narrow scope of the statutory definitions of 'advertising' or 'trade'"); *Hampton v. Guare*, 195 A.D.2d 366, 366, 600 N.Y.S.2d 57, 58 (1st Dep't 1993) ("[W]orks of fiction and satire do not fall within the narrow scope of the statutory phrases 'advertising' and 'trade'"); *Krupnik v. NBC Universal, Inc.*, 37 Misc. 3d 1219(A), 2010 WL 9013658, at *6 (Sup. Ct. N.Y. Cnty. June 29, 2010) ("New York courts have repeatedly ruled

that use of a person's likeness in movies or other entertainment media, similar to the circumstances here, does not constitute use for advertising or purposes of trade, and are not actionable under Section 51, because works of fiction do not fall within the narrow scope of the statutory definitions of 'advertising' or 'trade.'" (internal quotation marks and citations omitted)).

The Film, which is before the Court, McFarland Decl., Ex. 2, is manifestly an expressive work.  It also does not even purport to be a documentary, and it is clearly not within the scope of a work created for purposes of advertising or trade under New York Civil Rights Law §§50 and 51.

Indeed, because the use of Plaintiff's image in the Film is related to a newsworthy purpose, the claim must be dismissed. New York courts have continually reaffirmed the principle that reports of newsworthy events and matters of public interest do not fit within the definition of "trade or advertising" and thus do not come within the scope of Section 51. *Messenger*, 94 N.Y.2d at 441, 706 N.Y.S.2d at 55.

Newsworthiness and the public interest (which are used interchangeably by New York courts) have been "defined in [the] most liberal and far-reaching terms," including going far beyond mere news, and extending to "include all types of factual, educational and historical data, or even *entertainment and amusement, concerning interesting phases of human activity in general*."  *De Gregorio v. CBS, Inc.*, 123 Misc. 2d 491, 493, 473 N.Y.S.2d 922, 924 (Sup. Ct. N.Y. Cnty. 1984) (emphasis added); *Messenger*, 94 N.Y.2d at 441-42, 706 N.Y.S.2d at 55 (noting that concepts of "newsworthiness" and matters of "public interest" are to be "broadly construed"); *Glickman v. v. Stern*, 19 Media L. Rep. (BNA) 1769, 1776 (Sup. Ct. N.Y. Cnty. Oct. 15, 1991) ("[C]ourts will not endeavor to supplant the editorial judgment of the media in

determining what is 'newsworthy' or of 'public interest.'"), *aff'd*, 188 A.D.2d 387, 592 N.Y.S.2d 581 (1st Dep't 1992).  Following this direction, New York courts routinely hold that, in the Section 51 context, "courts should be wary not to supplant the editorial judgment of the media in determining what is 'newsworthy' or of 'public interest.'" *Lemerond v. Twentieth Century Fox Film Corp.*, No. 07 Civ. 4635(LAP), 2008 WL 918579, at *2 (S.D.N.Y. Mar. 31, 2008).  *See also* Finger, 77 N.Y.2d at 144, 564 N.Y.S.2d at 1017 ("questions of 'newsworthiness' are better left to reasonable editorial judgment and discretion . . . [and] judicial intervention should" be rare); *Gaeta v. Home Box Office*, 169 Misc. 2d 500, 503, 645 N.Y.S.2d 707, 709 (Civ. Ct. N.Y. Co. 1996) (internal quotation omitted) (courts have "a narrow scope of review . . . in evaluating editorial judgments as to what constitutes a matter of genuine public interest for purposes of Civil Rights Law §§ 50 and 51").

*Lemerond v. Twentieth Century Fox Film Corp.*, 2008 WL 918579, at *3, shows the true breadth of the newsworthy exception.  In that case, the court found that the use of plaintiff's image in the comedy mock-documentary *Borat* was not actionable under Section 51.  "[T]he movie contains a series of clips of [the] Borat [character] greeting and otherwise interacting with people in New York City, chronicling their various reactions," – and plaintiff was one of these unsuspecting people.  *Id.* at *1.  The court specifically found the movie to be newsworthy even though the "movie employs as its chief medium a brand of humor that appeals to the most childish and vulgar in its viewers."  *Id*. at *3.

Here, there can be no question that the Film, which explores the important issues of massive financial and securities fraud, was newsworthy.  And, to the extent Plaintiff's image was used in the Film, it was used to details this important topic.  The claims based on the use of his image, therefore, must be dismissed.

## V.   COUNTS TWO AND THREE OF THE COMPLAINT PURPORT TO STATE COMMON LAW CLAIMS FOR INVASION OF PRIVACY; NEW YORK DOES NOT RECOGNIZE SUCH CLAIMS

Count Two of the Complaint differs from Count One in that Plaintiff does not plead, within Count Two, the protections of New York Civil Rights Law §§50 and 51.  Plaintiff thus appears to be relying upon a common law right of privacy.  *See* Cpt., ¶¶47-51.

Similarly, the third count asserts that the preparation and distribution of the Film containing Plaintiff's image, likeness and characterization is a violation of Plaintiff's "common law propriety [sic] right to exclusive control of the commercial use of his image, likeness and characterization."  *Id*. Both the second and third counts must be dismissed, because it is well-established that there is no common law right to privacy or publicity in New York, so that a party seeking relief must rely upon Civil Rights Law §§50 and 51 as the only remedy for such claims. *See Groden v. Random House, Inc*., 61 F.3d 1045, 1049 (2d Cir. 1995); *Lan Sang v. Ming Hai*, 951 F.Supp.2d 504, 525 (S.D.N.Y. 2013); *Burck v. Mars, Inc*., *supra*, 571 F.Supp.2d at 450.

Accordingly, the Second and Third Counts, asserting common law rights of privacy, must be dismissed.

## VI.   THE FOURTH CLAIM, FOR LIBEL, MUST BE DISMISSED BECAUSE THE FILM'S PORTRAYAL OF NICKY KOSKOFF IS NOT "OF AND CONCERNING" ANDREW GREENE

In order to prevail on a libel claim, Plaintiff must demonstrate that the allegedly defamatory statement is "of and concerning" him.  *Diaz v. NBC Universal, Inc*., 536 F.Supp.2d 337, 339 (S.D.N.Y. 2008).  The "of and concerning" element of a libel claim is typically a factual question for the jury, but "the court properly may dismiss an action pursuant to Rule 12(b)(6) where the statements are incapable of supporting a jury's finding that the allegedly libelous statements refer to plaintiff."  *Church of Scientology Intern. v. Time Warner, Inc*., 806 F.Supp. 1157, 1160 (S.D.N.Y. 1992) (quotations omitted).

14

The Film *The Wolf of Wall Street* does not purport to be a documentary.  It presents itself as a dramatization of the career and milieu of Jordan Belfort and the massive securities fraud known as Stratton Oakmont.  A similar situation was presented by *Davis v. Costa-Gavras*, 654 F.Supp.653 (S.D.N.Y. 1987).  There, the filmmaker created the film *Missing* based upon a book entitled *The Execution of Charles Horman*.  The film, though based on the non-fiction book, included ". . . fictional characters and a composite portrayal of the American military presence in Chile at the time of the uprising and Allende coup."  The court granted summary judgment for the defendants on the defamation claim brought by Ray Davis, who claimed that he had been portrayed by the film's villainous "Ray Tower."  As the court noted:

> "The theme of the film is the search for a missing man by his father and his wife.  The man who disappeared is finally found to have been executed by the Chilean military.  The film is *based upon* a true story.  It is only in that setting that the composite conduct of the American government representatives in Chile at that time and the degree of their assistance in that search comes under scrutiny and criticism.  There is no person named Ray Davis referred to in the film at any time.  Ray Tower, with whom the plaintiff associates himself, is a symbolic fictional composite of the entire American political and military entourage in Chile." (italics in original) *Id*. at 655.

As the court further noted, films of this kind:

> ". . . utilize simulated dialogue, composite characters, and a telescoping of events occurring over a period into a composite scene or scenes.  This treatment is singularly appropriate and unexceptionable if the context is not distorted when dealing with public and political figures.
> Self-evidently a docudrama partakes of author's license—it is a creative interpretation of reality—and if alterations of fact in scenes portrayed are not made with serious doubts of truth of the essence of the telescoped composite, such scenes do not ground a charge of actual malice."  *Id*. at 658.

A similar approach was taken in *Cerasani v. Sony Corporation*, 991 F.Supp. 343 (S.D.N.Y. 1998).  Defendants had produced the motion picture *Donny Brasco*, which purported to be based upon a true story that was told in the book *Donnie Brasco: My Undercover Life in the Mafia*.  Plaintiff was a habitual criminal and Mafia associate who denied involvement in,

among other things, a vicious beating of a truck driver during a hijacking that was depicted in the film.  Similarly to the present case, the credits to the *Donnie Brasco* film  ". . . explained that certain characters depicted in the film are 'composites or fictional characters and certain scenes are fictional.'"  *Id*. at 349.  Defendants moved to dismiss pursuant to Rule 12(b)(6), and the court granted the motion based in part upon the fact that plaintiff was libel-proof, and also upon the fact that the truck hijack scene was part of a montage of scenes that could not support the inference that the character the plaintiff associated with himself was involved in all of the criminal activities of the Mafia chieftain who was the principal target of the character Donnie Brasco.  Id. at 355-56.  Here, as in *Davis v. Costa-Gravas* and *Cerasani v. Sony Corporation*, the Film explicitly refrains from equating the composite character "Nicky" with Plaintiff or any other particular individual.  Therefore, no reasonable fact finder could conclude that the actions of "Nicky" have defamed the Plaintiff.

## VII.   THE FIFTH COUNT, ALLEGING LIBEL PER SE ON A THEORY OF NEGLIGENCE, MUST BE DISMISSED

Plaintiff's Fifth Claim alleges a theory of libel per se that is identical to the Fourth Claim, except that, in paragraph 65, Plaintiff alleges: "The Defendants acted negligently as to the truth or falsity of the statements."

The Fifth Claim, by relying on a theory of negligence, ignores the development within the State of New York of the *Chapadeau* standard enunciated in *Chapadeau v. Utica-Observer-Dispatch, Inc*., 38 N.Y.2d 196, 199, 341 N.E.2d 569, 571, 379 N.Y..2d 61, 64 (1975).  The Court of Appeals held that "where the content of the article is arguably within this sphere of legitimate public concern, which is reasonably related to matters warranting public exposition, the party defamed may recover" if he or she can establish "by a preponderance of the evidence, that the publisher acted in a grossly irresponsible manner without due consideration for the standards of

16

information gathering and dissemination ordinarily followed by responsible parties." *Id.* Plaintiff has not alleged, nor can Plaintiff allege, that the use of composite characters in a non-documentary theatrical film is either "grossly irresponsible" or lacks "due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties."

New York courts broadly define which matters are within the sphere of legitimate public concern.  According to the New York Court of Appeals, "[t]he press, acting responsibly, and not the courts must make the *ad hoc* decisions as to what matters are of genuine public concern, and while subject to review, editorial judgments as to news content will not be second-guessed so long as they are sustainable." *Gaeta v. N.Y. News Inc.,* 62 N.Y.2d 340, 349 (1984).  *Accord, Huggins v. Moore,* 94 N.Y.2d 296, 303 (1999) (absent clear abuse, "the courts will not second-guess editorial decisions as to what constitutes matters of genuine public concern"); *Cottom v. Meredith Corp.,* 65 A.D.2d 165, 170 (4th Dep't 1978) ("a commercial enterprise's allocation of its resources to specific matters and its editorial determination of what is 'newsworthy,' may be powerful evidence of the hold those subjects have on the public's attention").

Courts routinely determine that issues related to financial performance and evaluation are matters of public concern.  *See Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 102 (2d Cir. 2000) ("statements by Prudential concerning appraisals of property [concern] a subject arguably within the sphere of legitimate public concern") (internal marks and citations omitted); *Treppel v. Biovail Corp.*, 233 F.R.D. 363, 375 (S.D.N.Y. 2006) ("The statements at issue concern alleged misconduct and bias by an analyst reporting in the media about publicly-traded companies: such matters affect the financial markets and are plainly of public concern"); *Post v. Regan,* 677 F. Supp. 203, 208 (S.D.N.Y. 1988) ("a loss to a public corporation of $165 million due to

unauthorized trading activities and the subsequent remedial actions taken by the corporation widely reported by the media, are of public concern."), *aff'd*, 854 F.2d 1315 (2d Cir. 1988). *Cf. Huggins*, 94 N.Y.2d at 302-03 (anything outside "the realm of mere gossip and prurient interest") (citation omitted).

Thus, Plaintiff cannot dispute that the Film with its depiction of the pervasive fraudulence and massive social costs effected by Stratton Oakmont amid an atmosphere of excess and debauchery, is "arguably within the sphere of legitimate public concern," and "reasonably related to matters warranting public exposition."

The Second Circuit discussed and applied the *Chapadeau* standard in *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 100-102 (2d Cir. 2000). There, a former real estate appraiser for an accounting firm claimed to have been defamed by the report of a law firm hired by defendant to perform independent investigations of the evaluation practices of the appraisers' employer. Applying *Chapadeau*, the Second Circuit found that Prudential had acted responsibly in commissioning the report and was not grossly irresponsible in disseminating it, and that Prudential's statements were therefore privileged. 234 F.3d at 102-03, 105-06. The *Chapadeau* standard continues to set the standard in New York, *e.g.*, *Posner v. Lewis*,18 N.Y.2d 566, 575, 965 N.E.2d 949, 955, 942 N.Y.2d 447, 453 (2012).[2] For this reason, where the publication at issue is arguably within the sphere of public concern, defamation claims based on a mere negligence standard must be dismissed. *Sarwer v. Conde Nast Publications, Inc.*, 237 A.D.2d 191, 654 N.Y.S.2d 768 (1st 1997) ("plaintiff had to allege and prove that defendant's investigatory process was 'grossly irresponsible' as measured against 'the standards of

---

[2] The Fifth Claim should also be dismissed for the same reasons as those stated for dismissal of the Fourth Claim, *i.e.*, that the Nicky Koskoff character is not a portrayal of Plaintiff, but is rather a composite character inspired by a number of individuals, of whom Plaintiff was only one.

information gathering and dissemination ordinarily followed by responsible parties'). *See also Cassini v. Advance Publications, Inc.,* 977 N.Y.S.2d 665, 665, 41 Misc.3d 1202(A), 1202(A) (Sup. Ct. N.Y. Cnty Apr 15, 2013)("Since the subject of the article was of legitimate public concern warranting public exposition, plaintiff was required to plead defendants' gross irresponsibility in investigating the accuracy of their reporting").

## VIII.   <u>CONCLUSION</u>

Nobody can reasonably dispute that the Film is about the bizarre travesty that was Stratton Oakmont, and that plaintiff was one of the malefactors whose central role in Stratton Oakmont inspired Mr. Scorsese's film. But no claim for invasion of privacy or libel can be made because plaintiff's name, image and likeness were not used, and the Film is an artistic work outside the scope of the statute's concern with uses for advertising or trade.  No claim for libel can be made because no character in the Film was Andrew Greene, so that the Film's portrayal of "Nicky Koskoff" was not "of and concerning" Andrew Greene.  For all the foregoing reasons, the Complaint should be dismissed in its entirety under Rule 12(b)(6), and the dismissal should be with prejudice in view of plaintiff's inability to amend the Complaint to address the deficiencies enumerated in the Motion.

DATED:  April 7, 2014                              Respectfully submitted,

                                                <u>      /s/ Louis P. Petrich</u>
                                                LOUIS P. PETRICH (admitted *pro hac vice*)
                                                LEOPOLD, PETRICH & SMITH, P.C.
                                                2049 Century Park East, Suite 3110
                                                Los Angeles, California 90067-3274
                                                Telephone:  (310) 277-3333
                                                Facsimile:   (310) 277-7444
                                                Email:  lpetrich@lpsla.com

                                                *Attorneys for  Defendants*
                                                *Paramount Pictures Corporation and*
                                                *Red Granite Pictures, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 7, 2014, the foregoing document was filed with the Clerk of the Court and served in accordance with the Federal Rules of Civil Procedure, and/or the Eastern District's Local Rules, and/or the Eastern District's Rules on Service upon the following parties and participants:

Aaron M. Goldsmith
225 Broadway, Suite 715
New York, NY 10007
Tel.: 914-588-2679
Fax: 212-566-8165
Email: aarongoldsmithlaw@gmail.com

*Counsel for Plaintiff*

_____/s/ Louis P. Petrich_____
Louis P. Petrich
LEOPOLD PETRICH & SMITH
2049 Century Park E - Suite 3110
Los Angeles, CA 90067
Telephone: (310) 277-3333
Fax: (310) 277-7444
lpetrich@lpsla.com