UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

ANDREW GREENE,

                              Plaintiff,

      -against-

PARAMOUNT PICTURES CORPORATION, a Delaware
corporation, RED GRANITE PICTURES, INC., a California
corporation, APPIAN WAY, LLC., a California limited
liability company, SIKELIA PRODUCTIONS, INC., a
Delaware corporation, and JOHN AND JANE DOES 1
THROUGH 10

                              Defendant(s),

-----------------------------------------------------------------------X

Docket No.:
**14 CV 1044(JS)(WDW)**

## RESPONSE MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

AARON M. GOLDSMITH, ESQ.
Attorney for Plaintiff
225 Broadway, Suite 715
New York, NY 10007
(914) 588-2679
*aarongoldsmithlaw@gmail.com*


STEPHANIE OVADIA, ESQ.
Attorney for Plaintiff
115 Meacham Avenue
Elmont, NY 11003
(516) 542-2133
*sovadia@aol.com*

## <u>PRELIMINARY STATEMENT</u>

This action was brought to recover money due to the Defendants' illegal/improper use of Plaintiff's likeness in the motion picture "Wolf of Wall Street."  The motion picture is based upon the book/memoir written of the same name authored by JORDAN BELFORT.  Mr. Greene, by and through the character named "Nicky Koskoff" in the motion picture, is portrayed engaging in morally repugnant behavior in the office environment; use of narcotics; and orchestrating a criminal money laundering scheme.  Mr. Greene maintains that he did not engage in acts amounting to sexual harassment at work; did not use narcotics of any kind in the office or during working hours; and has not committed any crimes, let alone masterminding an international money laundering scheme for which others went to jail.  It is important to note that Mr. Greene has never been charged with any criminal activity surrounding his tenure at STRATTON OAKMONT, the brokerage firm at the center of the memoir and motion picture.

Quite opposite, Mr. Greene had a reputation of trying to legitimize the activities of STRATTON OAKMONT and developing compliance procedures.  Mr. Greene is an inactive member of the California bar; a member of the New York State bar and has worked in the financial industry for years during since his time at STRATTON OAKMONT.

The Complaint sets forth five (5) causes of action.  First, Second and Third causes of action sound in Defendants' violation of sections 50 and 51 of the New York State Civil Rights Law for using Mr. Greene's likeness for commercial purposes without his permission.  Fourth, that Defendants' actions constitute libel *per se* for the malicious depiction of the character based on Mr. Greene.  Fifth, that Defendants' actions constitute libel *per se* for the negligent depiction of the character based on Mr. Greene.

The memoir was published in 2007.   The motion picture was released in or about December, 2013.   The motion picture establishes that it is based upon the memoir rather than being a strict adaptation.   The memoir contains specific descriptions of Mr. Greene and identifies him as the character nicknamed "Wigwam," due to his use of a toupee.   The character "Nicky Koskoff" wears a toupee, is of a similar position in the corporation and is nicknamed "Rugrat" for use of the toupee.

It is undisputed in Defendants' motion to dismiss pursuant to Rule 12(b)(6) that they made no attempt to seek the permission, let alone gain Mr. Greene's permission, to use his likeness in the motion picture.   The similarity of Mr. Greene's likeness, by both visage and relative position in the company are undeniable and recognized by the public, as established in the affidavit of Mr. Greene, and Affirmations of Norman B. Arnoff, Esq. and Neil M. Kaufman, Esqs., attached hereto and made a part hereof.   Accordingly, Plaintiffs first three (3) causes of action must be maintained.

The motion picture's scenes concerning Mr. Greene were false, defamatory, and fundamentally injurious to Mr. Greene's professional reputation both as an attorney and as an investment banker / venture capitalist as well as his personal reputation.   The affidavit of ANDREW GREENE is attached hereto and made a part hereof.   Accordingly, the fourth and fifth causes of action must be maintained.

## PROCEDURAL HISTORY

Plaintiff's Summons and Complaint were filed on February 18, 2014.   The moving Defendants were served on or about February 21, 2014.     On or about March 20, 2014 the parties entered into a stipulation granting the moving Defendants an extension of time to respond to the Complaint herein. See Doc.6.  On or about April 7, 2014, the moving Defendants filed the

instant motion to dismiss pursuant to Rule 12(b)(6).  See Doc.12.  On or about April 11, 2014, the parties entered into a stipulation to extend time to respond and briefing schedule.  See Doc. 13.

It should be noted that Defendants' motion does not contest Venue or Jurisdiction.

## **MOTION TO DISMISS**

The Defendants' motion fails to demonstrate a lack of legal merit or inability of Plaintiff to satisfy the elements of the causes of action.  Therefore, Defendants' motion must be denied in its entirety.

Rule 12(b)(6) of Federal Rules of Civil Procedure permits a party to move for dismissal where the Plaintiff "fails to state a claim upon which relief may be granted."

In recent years, the Supreme Court has established the "plausibility" standard for which 12(b)(6) motions are analyzed.  Under *Bell Atlantic Corp v Twombly*, 550 US 544 (2007), the Court established essentially a two-step process in evaluating whether a claim should survive a 12(b)(6) attack.  The first step requires the review for "merely legal conclusions resting on prior [factual] allegations."  *Id* at 564.  The second step requires the review of remaining facts to determine if there is "enough factual matter" to "nudge[] their claims across the line from conceivable to plausible…."  *Id* at 556, 570.

The Supreme Court expounded upon its ruling in *Twombly* to all civil actions in *Ashcroft v Iqbal*, 556 US 662,129 S.Ct. 1937 (2009).  However, as Justice Souter (the author of the *Twombly* majority) cautioned in his dissent to *Iqbal*, no matter how skeptical, 12(b)(6) does not require dismissal based upon a Judge's disbelief of the factual allegations, absent claims that are "sufficiently fantastic to defy reality…."  *Id* at 1959 (Souter, dissent)(quoting *Neitzke v Williams*, 490 US 319, 327 (1989)).

In the midst of the Supreme Court's evolution of the 12(b)(6) standard, the Second Circuit maintained a similar pragmatic approach.  *Ross v Bank of America*, 524 F3d 217 (2d Cir.2008) held that "asking for plausible grounds to infer [a cause of action] does not impose a **probability** requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal [such] evidence…." *Id* at 225.  (emphasis added)

While the legal analysis may be abrogated to some extent by "plausibility" standard developed in *Twombly* and *Iqbal*, the Second Circuit's discussion in *Geisler v Petrocelli*, 616 F2d 636 (2d Cir.1980) bears a cogent foreshadowing of Mr. Greene's case.  *Geisler* dealt with a book, whose author transposed the exact name and matching physical description of a former female co-worker onto a transsexual tennis professional embroiled in fraud, and explicit sexual exploits.  The Second Circuit ultimately held that a factual analysis is put to the trier of fact, but also described the nature of libel suits befitting the current case.

> "…it is required that the reasonable reader must rationally suspect that the protagonist is in fact the plaintiff, notwithstanding the author's and publisher's assurances that the work is fictional. This points up the disturbing irony inherent in the scheme: **the more virtuous the victim of the libel, the less likely it will be that she will be able to establish this essential confusion in the mind of the third party. Thus, the more deserving the plaintiff of recompense for the tarnishing of a spotless reputation, the less likely will be any actual recovery.** Such a seeming contradiction is best resolved by the trier of fact since adjudication of the issue as a matter of law will seldom satisfy the expectation that legal holdings be consistent and logical." *Id* at 637. (emphasis added)

Accordingly, the Complaint must include enough facts to establish the plausibility of its allegations but need not be so detailed and complete as to establish probability, in order to survive a Rule 12(b)(6) motion.

The instant Complaint was crafted with sufficient details to provide Defendants with notice of the nature of the claim and setting forth the plausibility of Mr. Greene's allegations.

### A.  The First Cause-of-Action

1.  <u>Privacy Actions Generally</u>

Plaintiff's first cause of action alleges a violation of New York State Civil Rights Law §§ 50 and 51.  §50 prohibits the use of an individual's "name, portrait or picture" for advertising or trade purposes without the individual's written consent.  §51 permits the individual whose likeness is used, as described in §50, to bring forth an action in Equity.

Under *Burck v Mars, Inc.,* 571 FSupp 2d 446 (SDNY, 2008), Federal Courts have recognized the balance between interpretations of the terms "name, portrait or picture" for public figures and private individuals.  In *Burck,* the Plaintiff's cause of action under §§ 50 and 51 of New York State Civil Rights Law was dismissed as the Court felt that the cartoon rendering of an M&M candy wearing the Plaintiff's trademarked outfit did not rise to the level of a "portrait or picture."  However, the Court upheld Plaintiff's claims for endorsement under the Lanham Act.  In its analysis, Judge Chin was careful to establish that a strict interpretation may not always be called for, in protecting the privacy interests of individuals.  The Court reasoned that a less strict standard should be applied for individuals who are not public figures or celebrities.

> *"Burck* argues that his "persona" as The Naked Cowboy qualifies as a 'portrait' or 'picture' within the meaning of Section 51. But the statutory right of privacy was not intended to protect the 'property interest of the celebrity in his or her public identity.' <u>Allen,</u> 610 F.Supp. at 621. Instead, Sections 50 and 51 were 'primarily designed to compensate for the hurt feelings of private people who find their identities usurped for another's commercial gain.' <u>Id.</u> This statutory purpose is reflected in the title of Article 5 of the New York Civil Rights law, 'Right of Privacy.' Although public figures do not forfeit their right of privacy, *see* <u>Onassis,</u> <u>122 Misc.2d at 614, 472 N.Y.S.2d 254,</u> aspects of their public personas not captured in their physical features or voice are not protected under the privacy statute, *see* <u>Allen,</u> 610 F.Supp. at 623 (under section 51, 'the commercial use

complained of [must] amount to a 'portrait or picture' of an individual, not merely the suggestion of some aspect of a person's public persona')."

*Burck v Mars*, 571 FSupp 2d at 453, <u>citing</u> *Allen v National Video, Inc.*, 610 FSupp 612 (SDNY, 1985) and *Onassis v Christian Dior-New York, Inc*., 122 Misc 2d 603, 26 NYS 2d 357 (NY Sup.Ct.1984).

The vast majority of cases that Defendants cite to, heard prior to *Burck*, also involve celebrities and public figures as the complaining parties.  The sole case after *Burck*, in *Harding v Paramount Pictures,* 2013 WL 174401, 2013 WL 1285243 (SDNY, 2013) , is wholly distinguishable as the Court determined that the plaintiff therein had no resemblance to the character in a video game.

Accordingly, the Southern District's distinction between the celebrity/public figure complainant and private citizen should be applied herein.  Mr. Greene is unquestionably a private citizen.  He is a member of the legal and financial communities that has suffered personal and professional loss and embarrassment as a result of the subject motion picture, as described in the Complaint.  Examples of the "Nicky Koskoff" character's resemblance to Mr. Greene, public recognition and damages as asserted in the Complaint are included in the affidavits attached hereto and made a part hereof.  As the Court can plainly see, Mr. Greene is indeed complaining of the "hurt feelings of private people who find their identities usurped for another's commercial gain.'" as both *Allen* and *Burck* contemplate.

As a result, the Court must find that Mr. Greene's first cause of action, under New York State Civil Rights Law §§ 50 and 51 actionable and dismiss Defendants' motion to dismiss in its entirety.

2.  <u>The Newsworthiness Exception</u>

Defendants curiously hedge their arguments against a violation of Mr. Greene's privacy by arguing that the motion picture should fall into the "newsworthiness" exception to his protections.   The motion picture should not fall within the ambit of the "newsworthiness exception" and Defendants' argument thereof both validates Mr. Greene's claims and undermines their privacy arguments.

Defendants also cite to *Walter v NBC Television Network, Inc*., 27 AD 3d 1069, 811 NY 2d 521 (4th Dept.2006), for its expansion of the "newsworthy" exception to protections afforded under Sections 50 and 51.  Plaintiff Claire Walter's photo was included with a car dealership's name and phone-number, purportedly provided by the dealership to be included with the "Headlines" segment of "The Tonight Show with Jay Leno."   The Court permitted causes of action against the dealership but dismissed the privacy cause of action against NBC Universal. In its reasoning, the Court found that the exception found for newsworthiness may be expanded for comedy and satire media.

> "<u>Sections 50</u> and <u>51 of the Civil Rights Law</u> "do not apply to reports of newsworthy events" (<u>*Messenger*, 94 NY2d at 441)</u>, and the issue whether an item is newsworthy is a question of law to be determined by the court (*see* <u>*Freihofer v Hearst Corp.*, 65 NY2d 135, 140-141 [1985]</u>; *Glickman v Stern*, 19 Media L Rptr 1769, 1775-1776, *affd* <u>188 AD2d 387 [1992]</u>). Newsworthiness is to be broadly construed (*see* <u>*Messenger*, 94 NY2d at 441</u>) and "liberally applied" (<u>*Finger*, 77 NY2d at 143</u>). A performance involving comedy and satire may fall within the ambit of the newsworthiness exception even if the performance is not related "to a 'legitimate' news broadcast [or event]" (*Glickman*, 19 Media L Rptr at 1775; *see* <u>*De Gregorio v CBS, Inc.*, 123 Misc 2d 491, 493 [1984]</u>; <u>*Paulsen v Personality Posters*, 59 Misc 2d 444, 448 [1968]</u>; *see also* <u>*Kane v Comedy Partners*, 2003 WL 22383387, 2003 US Dist LEXIS 18513</u> [SD NY], *affd* <u>98 Fed Appx 73 [2004])</u>." *Id*. at 1070-1071.

In the case-at-hand, the "newsworthiness exception" articulated in *Walter* should not apply. The newsworthiness exception has frequently been applied to matters of current events and social commentary.

Defendants also cite to *Messenger v Gruner & Jahr Printing & Publ'g*, 208 F3d 122 (2d Cir.2000), the Second Circuit limited statutory rights of privacy. However, in *Messenger* the Plaintiff was a child model whose photograph was sold to publications and used in connection with a magazine article that Plaintiff conceded was newsworthy and bore no relationship with the photograph itself.

In *Freihofer v Hearst Corp*, 102 AD 2d 974, 665 NY 2d 135 (3d Dept.1984), Plaintiff sued for a local papers publication of allegations made in pleadings of divorce litigation. The Court described the newsworthiness exception to the New York State's privacy laws, but also distinguished that,

> "if, as plaintiff alleges here, such a story is neither newsworthy nor of public interest, publication merely to increase circulation would violate the statute (see *Sutton v Hearst Corp.*, 277 App Div 155; *Lahiri v Daily Mirror*, 162 Misc. 776; see, also, *Ali v Playgirl, Inc.*, 447 F.Supp. 723). We believe that application of the statute must be decided on a case-by-case basis and that there must be a factual determination (*Sutton v Hearst Corp.*, *supra*; *Pittera v Parade Pub.*, 29 Misc.2d 90). Therefore, we agree that on the record which was before Special Term, it was impossible to summarily decide the issue either way as a matter of law." *Id.* at 975.

The motion picture accounts for events that happened in or about 1990-1996. The motion picture was advertised as a fictitious adaption of true events. By no stretch is the motion picture similar to a newspaper, nightly news program, or television show discussing current events and reporting upon matters of social development and commentary. The story of STRATTON OAKMONT was no more a matter of general public interest than any other

securities fraud or brokerage failed from the hubris of its officers.  The motion picture was approximately two (2) decades removed from the true life events it fictionalized and dramatized.

Mr. Greene is a private citizen whose likeness was used for the commercial gain of Defendants.

Defendants' argument regarding the newsworthiness exception clearly belies their arguments that the "Nicky Koskoff" character is an amalgam and not intended to portray Plaintiff specifically.  Yet while the story depicted in the motion picture was based upon the memoirs of the man in charge of the brokerage firm, who was jailed for his activities therein, it was far from current event and not so notable an incident for the fictionalization and dramatization to be deemed newsworthy.

Accordingly, the Defendants' arguments for the "newsworthy exception" to New York State's Privacy Law should be partially accepted in fact, that Mr. Greene is indeed portrayed by characterization in the motion picture.  However, Defendants' arguments in applicable law must be denied, as the motion picture's content cannot be deemed to be newsworthy.  As a result, Defendants' motion to dismiss the first cause of action must be denied in its entirety.

3.  Use of "Name, Portrait or Picture"

The motion picture's character "Nicky Koskoff" is a sufficiently distinguishable likeness of Plaintiff to satisfy this element of the first cause of action.

While the name is different, and the motion picture did not use an actual photograph of Plaintiff to establish the character, the likeness was so significantly similar as to cause members of the public to recognize the character as Mr. Greene.

10

Most notable is the character's toupee.  As recited in both the Complaint and in Defendants' submission, Mr. Greene was identified directly in JORDAN BELFORT's memoir.  As discussed in both the Complaint and in Defendants' submission, Mr. Greene's use of a toupee was mocked by Mr. Belfort and others IN STRATTON OAKMONT.  The memoir refers to Mr. Greene as "Wigwam," while the motion picture refers to the "Nicky Koskoff" character with the similarly punned nickname of "Rugrat."

The memoir discusses Mr. Greene's childhood relationship with JORDAN BELFORT and entry into STRATTON OAKMONT.  Similarly the motion picture describes the relationships between many of the supporting characters and that of Mr. Belfort as being childhood friends.  The memoir discusses Mr. Greene's law school education.  The motion picture portrays "Nicky Koskoff" as being the only childhood friend to have gone to law school.  The Defendants' submission even recites portions of the memoir describing Mr. Greene's – then – "frumpy" body compared to the "Nicky Koskoff" character's overweight stature.

While Defendants seek to argue the strictest interpretation of the terms "name, portrait or picture," in their submission, the case-law clearly evidences an analysis not on strict interpretation but whether the medium captures a Plaintiff's "persona" or "features," as discussed in *Burck* and *Allen*.

Even if the Court were to ignore the plausibility standard of 12(b)(6) motions and look to the weight of evidence, Defendants' motion fails to sufficiently argue the lack of merit in the first cause of action.  As a result, Defendants' motion to dismiss the first cause of action must be denied in its entirety.

11

4.   Advertising and Trade

The motion picture was unquestionably a medium produced to generate funds for Defendant corporations.

The Defendants' arguments against the trade-value element of the cause of action are pure contradiction.  The arguments on pages 10-13 of their submission weaves an alternating dance between case-law and assertions that the "newsworthiness exception" to privacy law also diminishes the "advertising and trade" element; while also asserting that the work is purely fictional and therefore so unrelated to Plaintiff as an individual that the trade element is immaterial to the case-at-hand.  In fact, a number of cases cited in page 13 of Defendants' submission are wholly misapplied.  The crux of those discussions was not upon the Courts' refusal to consider cases involving entertainment media, but rather the Court's standard articulated above in Plaintiff's discussion of the standards of New York privacy law and the "newsworthiness exception," that the analysis thereof is not preferred for judicial intervention but one that must be made factually, and on a case-by-case basis.  "We believe that application of the statute must be decided on a case-by-case basis and that there must be a factual determination…."  *Freihofer v Hearst Corp*, 102 AD 2d at 975, citing *Sutton v Hearst Corp.*, *Pittera v Parade Pub.*, 29 Misc.2d 90.

Case-law supports the notion that media produced for profit, or to increase revenue, satisfies the "advertising and trade" element of Sections 50 and 51 of New York State Privacy Law.

Accordingly, Defendants' motion to dismiss the first cause of action must be denied in its entirety.

12

**B.  The Second Cause-of-Action**

Defendants argue that Plaintiff's Second Cause of Action sounds in common law invasion of privacy, and that New York Courts do not recognize such a right.  While Plaintiff did not specifically cite of Section 51 of New York State Privacy Law, the second cause of action seeks injunctive relief.   Injunctive relief is clearly the equitable action that is supported statutorily by New York State Privacy Law §51.

Accordingly, Defendants' motion to dismiss the second cause of action must be dismissed in its entirety.

**C.  The Third Cause-of-Action**

Defendants argue that Plaintiff's Third Cause of Action sounds in common law invasion of privacy, and that New York Courts do not recognize such a right.  Similar to the Second Cause of Action, the Plaintiff's Third Cause of Action seeks equitable relief of injunction.  While New York Courts may not support a common law right to privacy, again Section 51 of the Privacy Law supports causes of action for both legal and equitable relief.

Accordingly, Defendants' motion to dismiss the second cause of action must be dismissed in its entirety.

**D.  The Fourth and Fifth Causes-of-Action**

Plaintiff's Fourth and Fifth Causes of Action sound in libel *per se*.  Defendants' motion as to the Fourth Cause of Action makes only one argument, that the "Nicky Koskoff" character cannot be proven to be "of and concerning" Plaintiff.  Defendants' motion as to the Fifth Cause of Action argues, similar to the "newsworthiness exception" to New York Privacy Law, that in dealing with questions of libel *per se*, the Courts have recognized a "sphere of public concern" that requires a showing of gross irresponsibility.

13

Libel *per se*, is defined as "A defamatory statement that is communicated in a fixed medium and is considered to be so harmful on its face that the plaintiff need not prove special damages. Examples of libel per se are statements that: (i) relate to the person's business or profession to the person's detriment; (ii) falsely claim that the person committed a crime of moral turpitude; (iii) imputes unchastity on the person; or (iv) claim that the person suffers from a loathsome disease." *Legal Information Institute*, dictionary, www.law.cornell.edu/wex/libel_per_se; see also, *Restatement (2nd) of Torts*, §§570-574; *Liberman v Gelstein*, 80 NY 2d 429 (1992); *Golub v Enquirer/Star Group, Inc*., 89 NY 2d 1074 (1997); and *Moore v Francis*, 121 NY 199 (1890); *600 West 115th Street Corp v Von Gutfeld*, 169 AD 2d 56 (1st Dept.1999)(words which "impute to Plaintiff the commission of an indictable offense upon conviction of which punishment may be inflicted…is defamation per se") quoting *Privitera v Town of Phelps*, 79 AD 2d 1 (4th Dept.1981); *Berkson v Time, Inc*., 8 AD 2d 352 (1st Dept.1959)(publication charging crime involving moral turpitude or importing "a criminal or disgraceful charge" is actionable per se); *Corrigan v Bobbs-Merrill Co.*, 228 NY 58 (1920)("[t]he fact that the publisher has no actual intention to defame a particular man or indeed to injure any one, does not prevent recovery of compensatory damages by one who connects himself with the publication…. The question is not so much who was aimed at, as who was hit.")

The motion picture depicts the "Nicky Koskoff" character engaging in securities fraud. Mr. Greene is an individual with ties to both the legal and financial industries. The portrayal in the film clearly relates to Mr. Greene's business or profession detrimentally. The "Nicky Koskoff" character is portrayed as orchestrating an international money laundering scheme for Mr. Belfort. Mr. Greene never orchestrated nor participated in acts of money laundering that Mr. Belfort ultimately was jailed for. Mr. Greene was never arrested nor indicted for any crimes

associated with his employment at STRATTON OAKMONT.  The "Nicky Koskoff" character was portrayed as using narcotics in the boardroom of STRATTON OAKMONT.  While Mr. Greene admits to using controlled substances, he asserts never having done them during working hours.  The motion picture clearly falsely claims that the character based on Plaintiff committed a crime of moral turpitude.

    1.  <u>"Of and Concerning" Mr. Greene</u>

Defendants correctly articulate that generally the "of and concerning" element is a factual element exclusively left to juries, absent a narrow circumstance where the Court may determine as a matter of law that the specific allegations included in a Complaint "are incapable of supporting a jury's finding that the allegedly libelous statements refer to plaintiff."  *Diaz v NBC Universal, Inc*., 536 FSupp2d 337, 339 (SDNY 2008) <u>citing</u> *Church of Scientology Intern. v Time Warner, Inc*. 806 FSupp 1157 (SDNY, 1992).

Defendants incorrectly rely on *Davis v Costa-Gavras*, 654 FSupp 653 (SDNY, 1987) and *Cerasani v Sony Corporation*, 991 FSupp 343 (SDNY, 1998).  In Davis, the film was a fictionalized account of a non-fiction book describing a political uprising and coup.  The film included fictionalized composite characters, made up of the actions and traits of a number of individuals.  The historical actions that made up the book and film encompassed hundreds of individuals that made the likelihood of confusion far less than the likelihood plead.

Here, Plaintiff was employed in a notable, but relatively small brokerage firm.  The correlation in characters between the subject motion picture and the memoir made for an obvious recognition by members of the public.  See the affidavit of Mr. Greene and Affirmations of Norman B. Arnoff, Esq. and Neil M. Kaufman, Esq., attached hereto and made a part hereof.

In *Cerasani*, the Plaintiff was an Associate of organized crime who denied involvement in a particular crime portrayed in the film *Donny Brasco*.  The Court pointed out that the particular scene with which the plaintiff complained of was only displayed as part of a montage of multiple crimes involving several characters in the film.  The Court reasoned that because the alleged crime was briefly portrayed in montage it was insufficient to form a basis that the public would confuse the plaintiff's actions with the overall behavior of mob capo and his crew as portrayed in the film.

Here, the "Nicky Koskoff" character figures prominently in several scenes.  The physical depiction and toupee, along with the relative title and stature within STRATTON OAKMONT make a clear correlation between Mr. Greene and "Nicky Koskoff."  Members of the public have recognized the character to be portraying Mr. Greene.  See the affidavit of Mr. Greene and Affirmations of Norman B. Arnoff, Esq. and Neil M. Kaufman, Esq. attached hereto and made a part hereof.

As discussed above, in the Complaint and in Defendants' submission, Mr. Greene was directly identified in the memoir.  The correlation between a series of physical descriptions and position within STRATTON OAKMONT link his mentions in the memoir as "Wigwam" to the character "Nicky Koskoff" or "Rugrat" in the subject motion picture.  Mr. Greene's use of a toupee was mocked by Mr. Belfort and others in STRATTON OAKMONT.  The memoir refers to Mr. Greene as "Wigwam," while the motion picture refers to the "Nicky Koskoff" character with the similarly punned nickname of "Rugrat."   The toupee became an icon of the character, almost the character itself in the subject motion picture.

The memoir discusses Mr. Greene's childhood relationship with JORDAN BELFORT and entry into STRATTON OAKMONT.   Similarly the motion picture describes the

16

relationships between many of the supporting characters and that of Mr. Belfort as being childhood friends.  The memoir discusses Mr. Greene's law school education.  The motion picture portrays "Nicky Koskoff" as being the only childhood friend to have gone to law school. The Defendants' submission even recites portions of the memoir describing Mr. Greene's – then "frumpy" - body compared to the "Nicky Koskoff" character's overweight stature.

Plaintiff does not assert himself as a Saint, but distinguishes himself from acts of criminal behavior that would have resulted in his loss of professional licensure and status.

As discussed above, the Court in *Geisler v Petrocelli* analyzed the predicament of the complainant in privacy and defamation cases.  This exact case was given in example of the rigors of libel *per se* litigation in the article, "Libel by Fiction: Greene v Paramount Pictures Corp.", Richard A. Altman, Esq., *Center for Art Law*, March 9, 2014, www.itsartlaw.com/tag/the-wolf-of-wall-street/.  "Greene is the opposite of Geisler."

Geisler's personal traits of being a mother of two (2) children with no history of exploit or impropriety was cited by the Court as distinguishing her from the character whose name and description matched hers.  The Court relied on her real-life virtuosity in determining the unreasonable possibility of public confusion between Geisler and the story's character. On the other hand, Mr. Greene's employment at STRATTON OAKMONT, his being named in several securities arbitrations surrounding the brokerage firm, if not the Defendants' misplaced references to Mr. Greene's involvement in *Sanders v Gardner*, 7 FSupp 2d 151 (EDNY, 2008), serve to strengthen the connection between Mr. Greene and "Nicky Koskoff."  "Thus, the more deserving the plaintiff of recompense for the tarnishing of a spotless reputation, the less likely will be any actual recovery." *Geisler*, at 637.

As Mr. Altman opined in his recent article noted above, "…considering the dictum in *Geisler*, the fact that Mr. Greene's reputation is not spotless ironically might make his likelihood of ultimate recovery greater than if the NASD had never penalized him and if the firm had never crashed and burned."

Accordingly, the Complaint provides sufficient factual detail to support the plausability of the allegations, and certainly provides the necessary threshold of information that the "Nicky Koskoff" character is "of and concerning" Mr. Greene.   As a result, Defendants' motion to dismiss the Fourth Cause of Action must be denied in its entirety.

    2.   The Sphere of Public Concern

In their motion to dismiss the Fifth Cause of Action, Defendants argue that the story told in the memoir and in the motion picture amount to a matter of "legitimate public concern," and therefore requires a showing of gross negligence.   While Plaintiff believes that he can show gross negligence on the part of Defendants, such a standard is not applicable as this motion picture does not fall within the "sphere of public concern."

It should be noted that Plaintiff believes that Defendants showed gross negligence in production of the motion picture by Screenwriter TERENCE WINTER'S near complete reliance upon JORDAN BELFORT for the truthfulness and accuracy of characters and accounts portrayed in the motion picture.   While Defendants argue that the motion picture was advertised as a fictional account, or "based upon" a true story, they also heavily rely upon the factual accuracy of depictions in favor of its "newsworthiness" and now "public concern" arguments. Accordingly, Defendants' lack of proper research should stand as gross negligence.   Indeed Defendants own actions may indicate this as well, as typically the "fictionalized characters"

disclaimer is one of the last, if not the last frame of credits.  In the subject motion picture, the disclaimer was the first frame of credits following the producers.

However, Plaintiff reiterates that the standard for "public concern" should not apply to the facts and circumstances herein.  Defendants rely on a number of cases that describe allegedly libelous statements in newspapers, periodicals and professional publications.  These cases routinely rely upon the distinction that editorial choices of newsworthiness are reflective of the public's interest contemporaneously.

Defendants' reliance on *Konikoff v Prudential Ins. Co. of Am*, 234 F3d 92 (2d Cir.2000) is simply misplaced.  Konikoff uses the *Chapadeau* standard of gross negligence in dismissing the defamation suit of a real estate appraiser for remarks made about her conduct in internal reports and reports to investors and shareholders of two (2) real estate funds.  Clearly the intended audience of investors and shareholders hold a significant stake in the performance of contractors whose research is used to make projections and investments.  The subject motion picture was created for entertainment purposes and released to a public audience worldwide twenty (20) years after the actual events.

More succinctly stated, periodicals, internal reports and news sources reflect what is on the public's mind during a relevant time.  The adapted story of a brokerage firm twenty (20) years after its demise does not fall within the same ambit of wide-spread curiosity.

Accordingly, Defendants' motion to dismiss the Fifth Cause of Action must be denied in its entirety.

## CONCLUSION

As a result of the foregoing Memorandum of Points and Authorities, with the Affidavit of ANDREW GREENE and Affirmations of NORMAN B. ARNOFF, ESQ. and NEIL M. KAUFMAN, ESQ., it must be determined that Plaintiff has satisfied the necessary threshold in pleadings to pursue his causes of action and to deny Defendants' motion to dismiss in its entirety; with such other and further relief as this Court deems just and proper.

Dated: May 6, 2014
       New York, NY

                                   _____/s/_____
                                   AARON M. GOLDSMITH, ESQ.
                                   Attorney for Plaintiff
                                   225 Broadway, Suite 715
                                   New York, NY 10007
                                   (914) 588-2679
                                   *aarongoldsmithlaw@gmail.com*

                                   STEPHANIE OVADIA, ESQ.
                                   Attorney for Plaintiff
                                   115 Meacham Avenue
                                   Elmont, NY 11003
                                   (516) 542-2133
                                   *sovadia@aol.com*

TO:
       LEVINE SULLIVAN KOCH & SCHULZ, LLP
       Katherine M. Bolger, Esq.
       Rachel F. Strom, Esq.
       321 West 44th St., Suite 1000
       New York, NY 10036
       *Kbolger@lskslaw.com*

       LEOPOLD, PETRICH & SMITH, PC
       Louis P. Petrich, Esq. (admitted *Pro Hac Vice*)
       2049 Century Park East, Suite 3110
       Los Angeles, CA 90067-3274
       *lpetrich@lpsla.com*
       Attorneys for Defendants PARAMOUNT, RED GRANITE & APPIAN WAY

## CERTIFICATION OF SERVICE

AARON M. GOLDSMITH, an attorney duly admitted to practice law before the Courts of the United States, Eastern District of New York, affirms the following under penalty of perjury:

That I am an attorney for Plaintiff in the above-entitled action; that I am not a party to this action; and that on the 6th day of May, 2014, I served the annexed *AMENDED* RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS, by ECF and electronic means, to the following:

LEVINE SULLIVAN KOCH & SCHULZ, LLP
Katherine M. Bolger, Esq.
Rachel F. Strom, Esq.
321 West 44th St., Suite 1000
New York, NY 10036
*Kbolger@lskslaw.com*

LEOPOLD, PETRICH & SMITH, PC
Louis P. Petrich, Esq. (admitted *Pro Hac Vice*)
2049 Century Park East, Suite 3110
Los Angeles, CA 90067-3274
*lpetrich@lpsla.com*

AND that I further filed the annexed MOTION, electronically.

These being the addresses of record, listed for service of the parties to the within action.

Dated: New York, NY
May 6, 2014

_____
S/Aaron M. Goldsmith, Esq.