UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
ANDREW GREENE,

                        Plaintiff,

        -against-

PARAMOUNT PICTURES CORPORATION, a
Delaware corporation; RED GRANITE            MEMORANDUM & ORDER
PICTURES, INC., a California                 14-CV-1044(JS)(SIL)
corporation; APPIAN WAY, LLC, a
California limited liability company;
SIKELLA PRODUCTIONS, INC., a Delaware
corporation; and JOHN AND JANE DOES 1
THROUGH 10,

                        Defendants.
------------------------------------X
APPEARANCES
For Plaintiff:          Aaron M. Goldsmith, Esq.
                        225 Broadway, Suite 715
                        New York, NY 10007


For Paramount
and Red Granite:        Louis P. Petrich, Esq.
                        Vincent Cox, Esq.
                        Leopold, Petrich & Smith P.C.
                        2049 Century Park East, Suite 3110
                        Los Angeles, CA 90067

                        Katherine Mary Bolger, Esq.
                        Levine Sullivan Koch & Schulz, LLP
                        321 West 44th Street, Suite 1000
                        New York, NY 10036

                        Rachel Fan Stern Strom, Esq.
                        Hogan Lovells US LLP
                        875 Third Avenue
                        New York, NY 10022


For Appian Way
and Sikella:            Katherine Mary Bolger, Esq.
                        Levine Sullivan Koch & Schulz, LLP
                        321 West 44th Street, Suite 1000
                        New York, NY 10036

SEYBERT, District Judge:

Plaintiff Andrew Greene ("Plaintiff") brings this diversity action against defendants Paramount Pictures Corporation, Red Granite Pictures, Inc., Appian Way, LLC, and Sikella Productions, Inc. (collectively, "Defendants"), alleging that Defendants, the producers and distributors of the motion picture <u>The Wolf of Wall Street</u>, violated his right of privacy and defamed him under New York law through the portrayal of a character in the movie. Defendants move to dismiss the Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (Docket Entry 12.) For the following reasons, Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART.

BACKGROUND

From 1993 to 1996, Plaintiff worked for Stratton Oakmont, Inc. ("Stratton Oakmont"), where he served on the Board of Directors and as the head of the Corporate Finance Department. (Compl. ¶ 18.) Stratton Oakmont was a notorious "over-the-counter" brokerage house based in Long Island, New York that stole millions of dollars from investors during the early 1990s through various "pump-and-dump" stock schemes. Jordan Belfort ("Belfort"), one of the firm's cofounders, was eventually arrested and served prison time for securities fraud and money laundering. Years later, he published a memoir chronicling the seven-year period during which

he operated the firm and oversaw its securities fraud. Belfort's memoir later served as the basis for the motion picture The Wolf of Wall Street (the "Movie"), directed by Martin Scorcese and starring Leonardo DiCaprio.

Plaintiff regards the Movie as an invasion of his right of privacy and defamatory under New York law. He brings this action against Defendants, claiming that one of the characters in the movie, Nicky "Rugrat" Koskoff ("Koskoff" or the "Koskoff Character"), is an identifiable portrayal of him. Plaintiff alleges that Koskoff engages in a number of illegal and morally questionable acts and contends that people who have watched the Movie believe that Koskoff is a depiction of him, causing damage to his reputation. Plaintiff seeks compensatory and exemplary damages in excess of $50 million, as well an injunction prohibiting future dissemination of the Movie and an order directing Defendants to turn over to Plaintiff copies of the Movie and any advertisements that contain Plaintiff's alleged likeness.

Belfort's memoir, also titled The Wolf of Wall Street (the "Memoir"), was first published in 2007 and rereleased in paperback with a cover promoting its association with the Movie. The Memoir is told from Belfort's perspective and purports to be "a true story based on [Belfort's] best recollections of various events in his life." (Memoir at Author's Note.) It provides a lurid account of Belfort's rise and fall and a glimpse into the

outlandish behavior that he claims occurred in his life and at Stratton Oakmont during the 1990s.  This behavior included drug use and prostitution in the office.

Plaintiff is prominently featured in the Memoir.  The Memoir identifies Plaintiff by his full name, Andrew Greene, and a nickname, "Wigwam," a reference to the toupee he wore at the time.  (Memoir at 65.)  Plaintiff is described as Stratton's lawyer and Belfort's "old and trusted friend," whose job was "to sift through dozens of business plans Stratton received each day and decide which, if any, were worth passing along to [Belfort]." (Memoir at 65.)  Physically speaking, he is described as "frump[y]" and having a "prodigious potbelly," (Memoir at 65), and his toupee is mocked incessantly throughout the Memoir.  For example, in the chapter introducing Plaintiff to the reader, Belfort describes Plaintiff's toupee as "the worst toupee this side of the Iron Curtain."  (Memoir at 65.)  The Memoir further describes Plaintiff as engaging in various types of illegal conduct related to Stratton Oakmont's securities fraud, which Plaintiff steadfastly denies.

Defendants released the Movie in December 2013.  (Compl. ¶ 31.)  As stated in the closing credits, the Movie purports to be "based on actual events"--i.e., the story told in the Memoir.  For the most part, the Movie's screenplay does track the storyline of the Memoir.  However, as the closing credits also explain, the Movie also contains some dramatic elements.  While purporting to

be "based on actual events," the closing credits also indicate that some of the events depicted are fictional and that some of the characters have fictional names or are composites of real-life individuals depicted in the Memoir. (See Movie, Closing Credits ("[C]ertain characters, characterizations, incidents, locations and dialogue were fictionalized or invented for purposes of dramatization.").) The closing credits further include a disclaimer that "[w]ith respect to such fictionalization or invention, any similarity to the name or to the actual character or history of any person . . . or any product or entity or actual incident, is entirely for dramatic purposes and not intended to reflect on an actual character, history, product or entity." (Movie, Closing Credits.)

The Movie does not use Plaintiff's name, nor does it contain an actual image of Plaintiff. Rather, Plaintiff complains that "[his] likeness, image, and characterization is portrayed through the character Nicky 'Rugrat' Koskoff." (Compl. ¶ 20.) In support of this allegation, Plaintiff cites several similarities between him and the Koskoff Character that allegedly make Plaintiff's "identity . . . readily apparent in the [Movie]." (Compl. ¶ 21.) For example, like Plaintiff, Koskoff is also "one of Jordan Belfort's close friends" who went to law school and later moves into "a significant leadership position at Stratton Oakmont upon Jordan Belfort's resignation from [Stratton Oakmont]."

(Compl. ¶¶ 22-25). Koskoff also wears a toupee, which is the subject of constant ridicule, and he has a similarly punned nickname, "Rugrat." (See Compl. ¶¶ 27-29.) Nonetheless, there are some differences between the Koskoff Character, on the one hand, and Plaintiff in real life and how he is depicted in the Memoir, on the other. For example, in the Movie, Belfort hires Koskoff as a broker when Stratton Oakmont opens in the late 1980s, while in real life, Plaintiff started at Stratton Oakmont in 1993 and was not a broker. In the Memoir, Gary Kaminsky ("Kaminsky"), the Chief Financial Officer of a company in which Belfort illegally held stock, arranges a meeting between Belfort and a Swiss banker who launders money for Belfort. (Memoir at 121.) Kaminsky and the Swiss banker are later arrested for money laundering in Miami, Florida. (Memoir at 338-39.) In the Movie, it is the Koskoff Character who arranges the meeting and is later arrested with the Swiss banker in Miami.

According to Plaintiff, the Movie is defamatory because it portrays the Koskoff Character "as a criminal, drug user, degenerate, depraved, and/or devoid of any morality or ethics." (Compl. ¶ 30.) Plaintiff points to the following scenes in particular. (Compl. ¶ 30.) In one scene, Koskoff is depicted shaving a female sales assistant's head who agreed to have her head shaved at the front of Stratton Oakmont's boardroom in exchange for $10,000, which she would use to pay for breast

augmentation surgery.  In the Memoir, Belfort claims that this incident occurred, but he does not implicate Plaintiff as actually performing the haircut.  (Memoir at 104.)  Plaintiff also points to the scenes where Koskoff accompanies Belfort to the meeting with the Swiss banker and is later arrested for money laundering. Plaintiff further alleges that Koskoff is depicted "in a reckless and depraved manner" in other scenes of the Movie, including scenes where he is engaged in drug use and sexual relations with prostitutes at work.  (Compl. ¶ 30.)

After the Movie was released, Plaintiff commenced this action, alleging that the portrayal of the Koskoff Character is libelous and violates his right of privacy under New York law. The Complaint contains five causes of action, which do not have substantive labels.  The Court reads the first and second causes of action to assert an invasion of Plaintiff's right of privacy under New York Civil Rights Law § 51, (Compl. ¶¶ 15-53)[1]; the Court reads the third cause of action to assert an invasion of

---

[1] The second cause of action differs from the first only in that it does not specifically cite to Section 51 of the New York Civil Rights Law.  In moving to dismiss the Complaint, Defendants therefore interpret the second cause of action to assert a common law right of privacy.  (See Defs.' Br., Docket Entry 12-1, at 14.)  The Court disagrees with Defendants' interpretation.  Although the second cause of action does not specifically mention Section 51, it tracks the language of the statute and does not indicate that it is based on a right derived from the common law.

Plaintiff's right of privacy under New York common law, (Compl. ¶¶ 54-56)[2]; and the fourth and fifth causes of action are in libel per se, (Compl. ¶¶ 57-66). Defendants move to dismiss the Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (Docket Entry 12.) This motion is fully briefed and currently pending before the Court.

DISCUSSION

## I. Legal Standard

In deciding a Rule 12(b)(6) motion to dismiss, the Court applies a "plausibility standard," which is guided by "[t]wo working principles." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); accord Harris v. Mills, 572 F.3d 66, 71-72 (2d Cir. 2009). First, although the Court must accept all allegations as true, this "tenet" is "inapplicable to legal conclusions;" thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678; accord Harris, 572 F.3d at 72. Second, only complaints that state a "plausible claim for relief" can survive a Rule 12(b)(6) motion to dismiss. Iqbal, 556

---

[2] Defendants also interpret the third cause of action to assert a common law right of privacy. (Defs.' Br. at 14.) The Court agrees with this interpretation, as the third cause of action specifically alleges that Defendants "have consciously and deliberately disregarded and violated Plaintiff's common law propriety [sic] right to exclusive control of the commercial use of his image, likeness, and characterization." (Compl. ¶ 55 (emphasis added).)

U.S. at 679. Determining whether a complaint does so is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.; accord Harris, 572 F.3d at 72.

The Court is confined to "the allegations contained within the four corners of [the] complaint." Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 71 (2d Cir. 1998). However, this has been interpreted broadly to include any document attached to the complaint, any statements or documents incorporated in the complaint by reference, any document on which the complaint heavily relies, and anything of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 152–53 (2d Cir. 2002) (citations omitted); Kramer v. Time Warner Inc., 937 F.2d 767, 773 (2d Cir. 1991).

## II. Right of Privacy

In the first and second causes of action, Plaintiff alleges that Defendants violated his statutory right of privacy under Section 51 of the New York Civil Rights Law because the Movie appropriates his likeness for commercial gain without his consent. (Compl. ¶¶ 15-53.) The third cause of action seeks to enforce a common law right of privacy based on the same factual premise. (Compl. ¶¶ 54-56.) Defendants argue that Plaintiff's statutory privacy claims should be dismissed because the Movie does not use Plaintiff's name, portrait, or likeness in a manner sufficient to

trigger the protections of Section 51 of the New York Civil Rights Law. (Defs.' Br. at 7-9.) They also move to dismiss Plaintiff's common law claim on the ground that New York law does not recognize a common law right of privacy. (Defs.' Br. at 14.) The Court agrees with Defendants on both grounds.

"New York does not recognize a common-law right of privacy." Messenger ex rel. Messenger v. Gruner + Jahr Printing & Pub., 94 N.Y.2d 436, 441, 727 N.E.2d 549, 551, 706 N.Y.S.2d 52, 55 (2000). Instead, New York provides a limited statutory right of privacy under Sections 50 and 51 of the New York Civil Rights Law that prohibits "nonconsensual commercial appropriations of the name, portrait or picture of a living person." Finger v. Omni Publ'ns Int'l, Ltd., 77 N.Y.2d 138, 141, 566 N.E.2d 141, 143, 564 N.Y.S.2d 1014, 1016 (1990). Section 50 makes it a misdemeanor to use a living person's "name, portrait or picture" for advertising or trade purposes "without having first obtained the written consent of such person." N.Y. CIV. RIGHTS LAW § 50. "Section 51 creates a private right of action for violations of Section 50." Naked Cowboy v. CBS, 844 F. Supp. 2d 510, 519 (S.D.N.Y. 2012). Section 51 states:

> Any person whose name, portrait, picture or voice is used within [the State of New York] for advertising purposes or for the purposes of trade without the written consent first obtained . . . may maintain an equitable action . . . against the person, firm or corporation so using his name, portrait,

> picture or voice, to prevent and restrain the use thereof; and may also sue and recover damages for any injuries sustained by reason of such use.

N.Y. Civ. Rights Law § 51.

The New York State Court of Appeals has consistently underscored that the privacy statute "is to be narrowly construed and 'strictly limited to nonconsensual commercial appropriations of the name, portrait or picture of a living person.'" Messenger, 94 N.Y.2d at 441, 727 N.E.2d at 552, 706 N.Y.S.2d at 55 (quoting Finger, 77 N.Y.2d at 141, 566 N.E.2d at 143, 564 N.Y.S.2d at 1016). "These statutory provisions prohibit the use of pictures, names or portraits 'for advertising purposes or for the purposes of trade' only, and nothing more." Finger, 77 N.Y.2d at 141, 566 N.E.2d at 143, 564 N.Y.S.2d at 1016 (emphasis in original) (citation omitted). Thus, to state a claim under Section 51, a plaintiff must allege: "'(1) the use of his name, portrait, or likeness; (2) for 'advertising purposes or for the purpose of trade;' (3) without written permission.'" Edme v. Internet Brands, Inc., 968 F. Supp. 2d 519, 528 (E.D.N.Y. 2013) (quoting Candelaria v. Spurlock, No. 08-CV-1830, 2008 WL 2640471, at *1 (E.D.N.Y. July 3, 2008)).

As noted, the Movie does not use Plaintiff's real name or an actual image of Plaintiff. What Plaintiff argues is that the Koskoff Character's physical resemblance to him and their

11

toupees, viewed in conjunction with their similar backstories and relative positions at Stratton Oakmont, make Plaintiff's "identity . . . readily apparent in the [Movie]." (Compl. ¶ 21.) Stated another way, Plaintiff argues that "the likeness [between him and Koskoff is] so significantly similar as to cause members of the public to recognize the character as [him]." (Pl.'s Opp. Br., Docket Entry 22, at 10.)

As an initial matter, Plaintiff's third cause of action, which asserts a common law right of privacy, must be dismissed because there is no common law right of privacy in New York. Duncan v. Universal Music Grp. Inc., No. 11-CV-5654, 2012 WL 1965398, at *4 (E.D.N.Y. May 31, 2012) (dismissing the plaintiff's common law right of privacy claim because "[i]t is well settled that New York does not recognize the common law right of privacy and that the exclusive remedy for such harm is provided under Sections 50 and 51").

Plaintiff's statutory claim also must be dismissed. It is well settled that Section 51 is to be construed narrowly and "[m]erely suggesting certain characteristics of the plaintiff, without literally using his or her name, portrait, or picture, is not actionable under the statute." Allen v. Nat'l Video, Inc., 610 F. Supp. 612, 621 (S.D.N.Y. 1985). Thus, New York courts have consistently dismissed Section 51 claims based on the use of a fictitious name, even if the depiction at issue evokes some

characteristics of the person or the person is identifiable by reference to external sources. See, e.g., Cerasani v. Sony Corp., 991 F. Supp. 343, 356 (S.D.N.Y. 1998) (depiction of the plaintiff's character under a fictitious name in the motion picture Donnie Brasco failed to state a Section 51 claim, "even assuming [that the plaintiff was] identifiable" as the character at issue); Wojtowicz v. Delacorte Press, 43 N.Y.2d 858, 860, 374 N.E.2d 129, 130, 403 N.Y.S.2d 218, 219 (1978) (affirming the trial court's holding that the depiction of the plaintiffs under fictitious names in the motion picture Dog Day Afternoon failed to state a Section 51 claim, despite that the plaintiffs were "portrayed . . . in sufficiently detailed accuracy of physical characteristics and activities as to result in their effective identification"); Springer v. Viking Press, 90 A.D.2d 315, 316, 457 N.Y.S.2d 246, 247 (1st Dep't 1982) (affirming the trial court's holding that the plaintiff failed to state a Section 51 claim even though the character in the novel State of Grace was based on the plaintiff, shared "some physical similarities" with the plaintiff, and had the same "common first name," but not the same last name, as the plaintiff), aff'd, 60 N.Y.2d 916, 458 N.E.2d 1256, 470 N.Y.S.2d 579 (1983); Waters v. Moore, 70 Misc. 2d 372, 375, 334 N.Y.S.2d 428, 433 (N.Y. Sup. Ct. Nassau Cnty. 1972) (depiction of the plaintiff's character under a fictitious name in the motion picture The French Connection failed to state a Section 51 claim, despite

that the plaintiff's "identity [could] be ascertained from his involvement with the actual event [depicted in the movie] or by reference to external sources"). Accordingly, even assuming Plaintiff shares some physical similarities with the Koskoff Character or is identifiable because of his position at Stratton Oakmont, his Section 51 claim still must be dismissed.

In sum, because the Movie does not use Plaintiff's name, portrait, or picture, Plaintiff's right of privacy claim under Section 51 must be dismissed. Plaintiff's common law right of privacy claim likewise fails because there is no such right under New York common law.

III. Defamation

"'The law of defamation serves to protect an individual's right to one's reputation.'" Kavanagh v. Zwilling, 997 F. Supp. 2d 241, 248 (S.D.N.Y. 2014) (quoting Idema v. Wager, 120 F. Supp. 2d 361, 365 (S.D.N.Y. 2000)), aff'd, 578 F. App'x 24 (2d Cir. 2014). Defamation is comprised of "'the twin torts of libel and slander' . . . . Spoken defamatory words are slander; written defamatory words are libel." Colodney v. Continuum Health Partners, Inc., No. 03-CV-7276, 2004 WL 829158, at *7 (S.D.N.Y. Apr. 15, 2004) (quoting Albert v. Loksen, 239 F.3d 256, 265 (2d Cir. 2001)). To state a claim of libel under New York law, a plaintiff must plead five elements: "'1) a written defamatory statement of fact concerning the plaintiff; 2) publication to a

third party; 3) fault (either negligence or actual malice depending on the status of the libeled party); 4) falsity of the defamatory statement; and 5) special damages or per se actionability ([i.e., that the statement is] defamatory on its face).'" Kavanagh, 997 F. Supp. 2d at 248 (alteration in original) (quoting Celle v. Filipino Reporter Enters. Inc., 209 F.3d 163, 176 (2d Cir. 2000)), aff'd, 578 F. App'x 24 (2d Cir. 2014).

In the fourth and fifth causes of action, Plaintiff alleges that the Movie is libelous because it depicts the Koskoff Character committing crimes and engaging in "outrageous and depraved sexual and drug activities." (Compl. ¶¶ 59, 64.) Plaintiff denies that he committed any of the acts depicted in the Movie, but contends that he is similar enough to the Koskoff Character that people who have watched the Movie have recognized the Koskoff Character to be a portrayal of him engaging in the alleged defamatory scenes, causing damage to his reputation. The fourth cause of action alleges that Defendants "acted with malice or acted with reckless disregard as to the truth or falsity of the [defamatory scenes]." (Compl. ¶ 60.) The fifth cause of action alternatively alleges that Defendants "acted negligently as to the truth or falsity of the [defamatory scenes]." (Compl. ¶ 65.)

Defendants argue that Plaintiff cannot plausibly allege that the Koskoff Character is "of and concerning" him because Koskoff is a fictional composite of various characters in the

15

Memoir who is only superficially similar to Plaintiff. (Defs.'
Br., Docket Entry 12-1, at 14-16, 18 n.2.) Defendants also argue
that the fifth cause of action, which alleges mere negligence,
should be dismissed because the Movie concerns an arguably
legitimate matter of public concern and therefore falls under the
standard set forth by the New York State Court of Appeals in
Chapadeau v. Utica Observer-Dispatch, 38 N.Y.2d 196, 199, 341
N.E.2d 569, 571, 379 N.Y.S.2d 61, 64 (1975), which requires the
allegedly defamatory statement to be published in "a grossly
irresponsible manner" in order to be actionable. (Defs.' Br. at
18-19.) For the reasons explained below, the Court agrees with
Defendants' argument related to the Chapadeau standard, but
disagrees with their argument regarding the "of and concerning"
element of Plaintiff's libel claims.

    A.    "Of and Concerning"

        As noted, "[a] statement is not libelous unless it is
'of and concerning' the plaintiff." Dalbec v. Gentleman's
Companion, Inc., 828 F.2d 921, 925 (2d Cir. 1987) (citation
omitted). This requirement "generally presents a factual question
for the jury." Diaz v. NBC Universal, Inc., 536 F. Supp. 2d 337,
342 (S.D.N.Y. 2008), aff'd, 337 F. App'x 94 (2d Cir. 2009).
However, "'the Court properly may dismiss an action pursuant to
Rule 12(b)(6) where the statements are incapable of supporting a
jury's finding that the allegedly libelous statements refer to

16

plaintiff.'"   Id. (quoting Church of Scientology Int'l v. Time Warner, Inc., 806 F. Supp. 1157, 1160 (S.D.N.Y. 1992), aff'd sub nom., Church of Scientology Int'l v. Behar, 238 F.3d 168 (2d Cir. 2001)).  Thus, "'[w]hether the complaint alleges facts sufficient to demonstrate a reasonable connection between the plaintiff and the alleged libel is . . . a question for the Court.'" Id. (quoting Church of Scientology Int'l, 806 F. Supp. at 1160); accord Gristede's Foods, Inc. v. Poospatuck (Unkechauge) Nation, No. 06-CV-1260, 2009 WL 4547792, at *13 (E.D.N.Y. Dec. 1, 2009).

Where, as in this case, the plaintiff claims that he or she has been defamed through the portrayal of a fictional character, "[t]he test is whether a reasonable person, viewing the [alleged defamatory work], would understand that the character portrayed in the [work] was, in actual fact, the plaintiff acting as described." Davis v. Costa-Gavras, 619 F. Supp. 1372, 1375 (S.D.N.Y. 1985); see also Fetler v. Houghton Mifflin Co., 364 F.2d 650, 651 (2d Cir. 1966) ("[T]he question is whether the libel designates the plaintiff in such a way as to let those who knew him understand that he was the person meant.  It is not necessary that all the world should understand the libel; it is sufficient if those who knew the plaintiff can make out that he is the person meant." (internal quotation marks and citation omitted)).  This inquiry necessarily requires a search for the similarities and dissimilarities between the plaintiff and the fictional character

so as to determine whether a person who knew the plaintiff could reasonably conclude that the plaintiff was the fictional character. Springer, 90 A.D.2d at 320, 457 N.Y.S.2d at 249.

Because the "of and concerning" inquiry is so fact specific, New York courts have failed to carve out consistent guidelines for determining how similar the plaintiff and the fictional character must be. Compare Geisler v. Petrocelli, 616 F.2d 636, 639-40 (2d Cir. 1980) (same name and similar physical characteristics found sufficient to withstand a motion to dismiss), and Felter, 364 F.2d at 651-62 (similar family composition and history held sufficient to present an issue of fact to a jury), with Springer, 90 A.D.2d at 320, 457 N.Y.S.2d at 249 (similarities in name, physical height, weight, build, incidental grooming habits, and recreational activities held insufficient to establish the "of and concerning" element in light of the "profound" dissimilarities "both in manner of living and in outlook"), and Carter-Clark v. Random House, Inc., 196 Misc. 2d 1011, 1014-15, 768 N.Y.S.2d 290, 294 (Sup. Ct. N.Y. County 2003) (different names and occupations and "very sketchy physical characterization" held insufficient to establish the "of and concerning" element), aff'd, 17 A.D.3d 241, 793 N.Y.S.2d 394 (1st Dep't 2005). Further complicating the issue is the counterintuitive nature of a libel by fiction claim. The plaintiff must simultaneously assert that the character is "of and

concerning" him and her because of their similarities, but also must deny significant aspects of the fictional character, i.e., the defamatory aspects of the character. Accordingly, New York courts have required the plaintiff in a libel by fiction case to show that the "description of the fictional character . . . [is] so closely akin to the real person claiming to be defamed that a reader [or viewer] of the [alleged defamatory work], knowing the real person, would have no difficulty linking the two. Superficial similarities are insufficient . . . ." Springer, 90 A.D.2d at 320, 457 N.Y.S.2d at 249.

Relying on Davis v. Costa-Gavras, 654 F. Supp. 653, 654 (S.D.N.Y. 1987) ("Davis II"), Defendants argue that even if Plaintiff shares "some superficial similarities" with Koskoff, Koskoff cannot be "of and concerning" Plaintiff as a matter of law, because he is a fictional composite of real-life people referenced in the Memoir. (Defs.' Br. at 14-16.) Defendants therefore contend that "[a] reader of the [Memoir] who sees the [Movie] would know that Nicky Koskoff is a composite, and someone who has not read the [Memoir] who sees the film would have no basis to connect Nicky Koskoff to [Plaintiff]." (Defs.' Reply Br., Docket Entry 24, at 6.) There are a few issues with this argument that render it unsound, at least at this stage of the litigation. First, by Defendants' own admission, the Movie is not a purely fictional work. It is based on a true story. Thus, it is plausible

to allege that someone who was aware of Stratton Oakmont's fraud and Plaintiff's role at the company could reasonably associate the Koskoff Character with Plaintiff. See Batra v. Wolf, No. 116059/04, 2008 N.Y. Misc. LEXIS 1933, at (Sup. Ct. N.Y. County Mar. 14, 2008) (same unique first name, ethnicity, and physical appearance in an episode of Law & Order depicting a public scandal held sufficient to present an issue of fact to a jury). Plaintiff should be permitted to take discovery on this issue.

Second, the holding in Davis II is wholly inapplicable to the present motion to dismiss, both substantively and procedurally. In Davis, the plaintiff alleged that he was defamed through the portrayal of a fictional composite character in the motion picture Missing, which was based on a nonfiction book about an American journalist killed during the 1973 Chilean coup d'état that deposed the government of then-Chilean President Salvador Allende Gossens. See Davis v. Costa-Gavras, 619 F. Supp. 1372, 1373 (S.D.N.Y. 1985) ("Davis I"). The plaintiff was a United States Military commander stationed in Chile during this time. Id. After a full evidentiary hearing, the Davis II court granted summary judgment in favor of the defendant filmmakers on the ground that there was no evidence of fault in their making of the film. Because the plaintiff was a public official, the court applied the "actual malice" standard for determining fault set out in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d

686 (1964). <u>Davis II</u>, 654 F. Supp. at 654. The court held that the use of a fictional composite character in the context of a "docudrama" did not establish the requisite evidence of actual malice. <u>Id.</u> The court never addressed the "of and concerning" element of the plaintiff's defamation and, in fact, the defendants previously conceded that the composite character in the movie was intended to represent the plaintiff. <u>Davis I</u>, 619 F. Supp. at 1375. Thus, <u>Davis II</u> does not, as Defendants suggests, stand for the broad proposition that a fictional composite character can never satisfy the "of and concerning" element of a defamation claim. <u>Davis II</u> is also distinguishable from this case from a procedural standpoint in that <u>Davis II</u> was decided after a full evidentiary hearing in connection with a motion for summary judgment.

In sum, given the alleged similarities between Plaintiff and Koskoff, and the public nature of Stratton Oakmont's fraud, Plaintiff has alleged sufficient facts to withstand Defendants' motion to dismiss with respect to the "of and concerning" element of Plaintiff's libel claim.

B. <u>Fault</u>

As noted, the plaintiff in a libel case must also demonstrate that the defendant culpably published the alleged false and defamatory statements. The standard of fault varies depending on the status of the plaintiff. As a federal

constitutional matter, if the plaintiff is a "public figure," he or she "must demonstrate by clear and convincing evidence that the defendant acted with 'actual malice.'" Biro v. Conde Nast, 963 F. Supp. 2d 255, 276 (S.D.N.Y. 2013). If the plaintiff is a "private figure," he or she "must show at least that the defendants were negligent with respect to the truth if the statement complained of bears on a matter of public concern." Lopez v. Univision Commc'ns, Inc., 45 F. Supp. 2d 348, 360 (S.D.N.Y. 1999). However, in Chapadeau v. Utica Observer-Dispatch, the New York Court of Appeals held that under New York law, a private figure complaining of defamation with respect to a matter that is "arguably within the sphere of legitimate public concern, which is reasonably related to matters warranting public exposition," may not recover unless he or she establishes that the defendant "acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties." Chapadeau, 38 N.Y.2d at 199, 341 N.E.2d at 571, 379 N.Y.S.2d at 64.

Here, assuming Plaintiff will assert that he is a private figure, the Chapadeau standard governs his defamation claim. The story told in the Memoir, which was later adapted in the Movie, unquestionably touches on a matter warranting public exposition. However, as noted, the fifth cause of action only alleges that Defendants acted with mere negligence, not gross negligence.

22

(Compl. ¶ 65.)  The Court therefore must dismiss Plaintiff's fifth cause of action.

IV.  <u>Leave to Amend</u>

Although Plaintiff has not requested leave to replead, the Second Circuit has stated that "[w]hen a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint."  <u>Hayden v. Cnty. of Nassau</u>, 180 F.3d 42, 53 (2d Cir. 1999); <u>see</u> <u>also</u> FED. R. CIV. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.").  Leave to amend should be granted unless there is evidence of undue delay, bad faith, undue prejudice, or futility.  <u>See</u> <u>Milanese v. Rust-Oleum Corp.</u>, 244 F.3d 104, 110 (2d Cir. 2001).  For the reasons articulated above, it would be futile to grant Plaintiff leave to replead his right of privacy claims, and those claims are hereby DISMISSED WITH PREJUDICE.  However, the Court GRANTS Plaintiff leave to replead his fifth cause of action to assert a libel claim based on gross negligence.

CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the Complaint (Docket Entry 12) is GRANTED IN PART and DENIED IN PART.  The motion is DENIED insofar as it seeks dismissal of Plaintiff's libel claims based on a failure to plead the "of and concerning" element of a defamation claim.  The motion is GRANTED with respect to Plaintiff's right of privacy claims, which are

DISMISSED WITH PREJUDICE.  The motion is also GRANTED with respect to Plaintiff's fifth cause of action based on negligent defamation and this claim is DISMISSED WITHOUT PREJUDICE and with leave to replead.  If Plaintiff wishes to file an amended complaint repleading this claim, he must do so within thirty (30) days of the date of this Memorandum and Order.  If Plaintiff fails to do so, Plaintiff's fifth cause of action will be dismissed with prejudice.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:    September   30  , 2015
          Central Islip, New York