UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
ANDREW GREENE,

                            Plaintiff,         <u>MEMORANDUM & ORDER</u>
                                                    14-CV-1044(JS)(SIL)

       -against-

PARAMOUNT PICTURES CORP., RED GRANITE
PICTURES, INC., APPIAN WAY, LLC, and
JOHN AND JANE DOES 1 through 10,

                         Defendants.
----------------------------------------X

**FILED**
**CLERK**
12/13/2018 12:24 pm
**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

APPEARANCES
Plaintiff:          Aaron M. Goldsmith, Esq.
                    225 Broadway, Suite 715
                    New York, NY 10007

                    Alexander Martin Dudelson, Esq.
                    Louis R. Rosenthal, Esq.
                    Law Office of Louis R. Rosenthal
                    26 Court Street, Suite 2306
                    Brooklyn, NY 11242

                    Stephanie G. Ovadia, Esq.
                    1080 Grand Avenue, Suite 200F
                    South Hempstead, NY 11550

For Defendants:    Louis P. Petrich, Esq.
                    Vincent Cox, Esq.
                    Leopold, Petrich & Smith P.C.
                    2049 Century Park East, Suite 3110
                    Los Angeles, CA 90067

                    Katherine Mary Bolger, Esq.
                    Rachel Fan Stern Strom, Esq.
                    Davis Wright Tremaine LLP
                    1251 Avenue of the Americas, 21st Floor
                    New York, NY 10020

SEYBERT, District Judge:

       Plaintiff Andrew Greene ("Plaintiff") filed this action

against defendants Paramount Pictures Corporation ("Paramount"),

Red Granite Pictures, Inc. ("Red Granite"), and Appian Way, LLC ("Appian Way," and collectively, "Defendants"),[1] the producers and distributors of the motion picture The Wolf of Wall Street (the "Movie"), alleging that he was defamed through the portrayal of a character in the Movie.  Presently pending before the Court is Defendants' motion for summary judgment.  (Defs.' Mot., Docket Entry 73.)  For the following reasons, Defendants' motion is GRANTED.

BACKGROUND

I.   Factual Background[2]

---

[1] Plaintiff also named Sikelia Productions, Inc. ("Sikelia") as a defendant, but pursuant to the Court's September 11, 2017 Memorandum and Order (the "September 2017 Order"), his claims against it were dismissed without prejudice for lack of subject matter jurisdiction.  Greene v. Paramount Pictures Corp., No. 14-CV-1044, 2017 WL 4011240, at *5 (E.D.N.Y. Sept. 11, 2017) ("Greene II").

[2] The following facts are drawn from Defendants' Local Civil Rule 56.1 Statement, (Defs.' 56.1 Stmt., Docket Entry 69-1), and Plaintiff's 56.1 Counterstatement, (Pl.'s 56.1 Counterstmt., Docket Entry 72, ¶¶ 98-116).  However, in some instances, Plaintiff supports factual propositions in his Counterstatement by citing to entire deposition transcripts, without pin citations.  For example, Plaintiff cites generally to "Plaintiff EBT," (see, e.g., Pl.'s 56.1 Counterstmt. ¶ 98), which is a document in excess of 300 pages that, according to Plaintiff, was "too voluminous to file electronically," (Goldsmith Decl., Docket Entry 74, ¶ 3; see generally Pl.'s Dep., Cox Decl. Ex. 40, Docket Entry 73-49).  The Court will not consider these inadequately supported statements.  See Russell v. Aid to Developmentally Disabled, Inc., No. 12-CV-0389, 2017 WL 4357412, at *1 n.3 (E.D.N.Y. Sept. 30, 2017) ("Plaintiff refers the Court to [p]laintiff's entire deposition transcript without providing direct citations. . . .  Facts met with these insufficient responses are deemed undisputed.").

2

Familiarity with the Court's September 30, 2015 Memorandum and Order (the "September 2015 Order"), see generally Greene v. Paramount Pictures Corp., 138 F. Supp. 3d 226 (E.D.N.Y. 2015) ("Greene I"), and the September 2017 Order, see generally Greene II, 2017 WL 4011240, is presumed, and the Court discusses only those facts necessary to the resolution of Defendants' motion.

A.  Plaintiff's 56.1 Responses

Initially, the parties dispute whether the Court should accept Plaintiff's Responses to Defendants' 56.1 Statement, since they do not comply with Local Civil Rule 56.1's requirements (1) that they respond, in correspondingly numbered paragraphs, to each numbered paragraph in Defendants' Statement and (2) that each statement be followed by a citation to admissible evidence.  Local Civ. R. 56.1(b) & (d); (see Defs.' Br., Docket Entry 73, at 2-4; Pl.'s Opp., Docket Entry 75, at 7-8.)

Plaintiff submitted his first non-compliant Rule 56.1 Response in advance of a pre-motion conference in this matter. (Pl.'s 56.1 Resp., Docket Entry 69-2.)  At the December 18, 2017 conference, the Court highlighted the Response's deficiencies and directed Plaintiff to file a compliant 56.1 Response.  (Dec. 2017 Minute Entry, Docket Entry 71.)  Plaintiff submitted an amended 56.1 Response that again failed to comply with Local Civil Rule 56.1.  (Pl.'s Am. 56.1 Resp., Docket Entry 72, ¶¶ 1-97.)  In his opposition to Defendants' summary judgment motion, Plaintiff

explains his curious choice to flout the Rule and the Court's order:

> At the pre-motion conference . . . Plaintiff's Counsel noted--quite accurately--that the vast majority of statements included in the multiple declarations and documentation [cited in Defendants' Rule 56.1 Statement] were irrelevant to the case-at-hand. The Court held that it was within the purview of the Court to determine the relevance of the Defendants' assertions . . . and provided a deadline for Plaintiff to file a revised Statement that matched paragraph-by-paragraph for the benefit of the Court's review as to which assertions are in contest. . . .
>
> . . . .
>
> Unfortunately, Defendants' 56.1 Statement was replete with superfluous and irrelevant assertions and materials seeking to prove the overall unethical, unprofessional and--in some instances--illegal conduct of Stratton Oakmont. . . . Plaintiff's allegations in the Complaint and assertions throughout this litigation have always been that he did not behave in the same fashion as the firm gained a reputation for. . . .

(Pl.'s Opp. at 7-9.)  Accordingly, despite Plaintiff's clear understanding of Local Civil Rule 56.1 and this Court's directive, he disregarded both and instead filed what amounts to a commentary --without citations to admissible evidence--on Defendants' evidence.  (See Pl.'s Am. 56.1 Resp.)  The Court thus disregards

4

Plaintiff's Responses and deems the facts in Defendants' 56.1 Statement to be admitted.[3]

B.  <u>Stratton Oakmont, the Memoir, and the Movie</u>

From 1993 to 1996, Plaintiff served as a director, general counsel, and head of the corporate finance department at Stratton Oakmont, Inc. ("Stratton Oakmont").  (Defs.' 56.1 Stmt. ¶¶ 13, 51-52; Pl.'s Dep. 44:18-21, 64:5-12.)  Stratton Oakmont was an infamous over-the-counter securities broker-dealer based in Long Island, New York that was subject to a host of disciplinary actions and charges involving, among other things, securities fraud and market manipulation.  (Defs.' 56.1 Stmt. ¶¶ 10, 20.) Jordan Belfort, one of Stratton Oakmont's cofounders, eventually pled guilty to securities fraud, money laundering, and related charges, for which he served prison time and was ordered to pay over $100 million in restitution.  (Defs.' 56.1 Stmt. ¶¶ 24, 26, 28; <u>U.S. v. Belfort, et al.</u>, Case No. 98-CR-0859, J., Docket Entry 135.)  In 2007, Belfort published <u>The Wolf of Wall Street</u>, a memoir chronicling his time operating Stratton Oakmont and overseeing its

---

[3] The Court has reviewed the evidence underlying the propositions in Defendants' Statement to ensure that they are adequately supported.  <u>See</u> <u>Giannullo v. City of N.Y.</u>, 322 F.3d 139, 140 (2d Cir. 2003) (noting that "'a Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record'") (quoting <u>Holtz v. Rockefeller & Co., Inc.</u>, 258 F.3d 62, 74 (2d Cir. 2001)).

securities fraud (the "Memoir").  (Defs.' 56.1 Stmt. ¶ 2); Greene I, 138 F. Supp. 3d at 229.

Plaintiff is prominently featured in the Memoir.  It identifies Plaintiff by his full name, Andrew Greene, and a nickname, "Wigwam"--a reference to the toupee he wore during his time at Stratton Oakmont.  (Memoir pp. 1-224, Belfort Decl. Ex. 1 Pt. 1, Docket Entry 73-3, at 65.)  Plaintiff is described as Stratton Oakmont's lawyer and Belfort's "old and trusted friend," whose job was "to sift through dozens of business plans Stratton received each day and decide which, if any, were worth passing along to [Belfort]."  (Memoir at 65.)  Physically speaking, he is described as "frump[y]" and having a "prodigious potbelly," (Memoir at 66), and his toupee is mocked incessantly throughout the Memoir.  For example, in the chapter introducing Plaintiff to readers, Belfort describes Plaintiff's toupee as "the worst toupee this side of the Iron Curtain." (Memoir at 65.)  The Memoir further describes Plaintiff as engaging in various types of illegal conduct related to Stratton Oakmont's securities fraud.

The Movie--starring Leonardo DiCaprio and directed by Martin Scorsese--is based on the Memoir and was released in the United States on December 23, 2013.  (Def.s' 56.1 Stmt. ¶¶ 2, 5.) As stated in the closing credits, the Movie purports to be "based on actual events"--that is, the story told in the Memoir.  (See Movie; Defs.' 56.1 Stmt. ¶ 90.)  For the most part, the Movie's

screenplay tracks the Memoir's storyline.  However, as the closing credits explain, the Movie contains some dramatic elements.  While purporting to be "based on actual events," the credits indicate that some of the events depicted are fictional and that some of the characters have fictional names or are composites of real-life individuals depicted in the Memoir.  (See Movie, Closing Credits ("[C]ertain characters, characterizations, incidents, locations and dialogue were fictionalized or invented for purposes of dramatization."); Defs.' 56.1 Stmt. ¶ 90.)  The closing credits further include a disclaimer that "[w]ith respect to such fictionalization or invention, any similarity to the true or to the actual character or history of any person . . . or any product or entity or actual incident, is entirely for dramatic purposes and not intended to reflect on an actual character, history, product or entity."  (Movie, Closing Credits; Defs.' 56.1 Stmt. ¶ 90.)

C.   The Koskoff Character

        Plaintiff claims that a character from the Movie, Nicky Koskoff ("Koskoff" or the "Koskoff Character")[4]--also known as

---

[4] The Koskoff Character was originally named "Andrew 'Wigwam' Cohen," reflecting Plaintiff's first name and nickname, but the producers changed the character's name to "Nicky 'Rugrat' Koskoff."  (Def.s' 56.1 Stmt. ¶ 76.)  The choice of the new name is related to the fact that a producer's husband is named Nicky Koskoff.  (Def.s' 56.1 Stmt. ¶ 76.)

"Rugrat," a nickname mocking the toupee that the character wears-
-is one that viewers understood to be a depiction of Plaintiff.
(Suppl. Compl., Docket Entry 2, ¶¶ 1, 20, 21, 28; Defs.' 56.1 Stmt.
¶ 7.)   Plaintiff avers that on thirty-three occasions, the
portrayal of Koskoff defamed him by showing him engaged in or
condoning criminal activity, drug use, sexual relations with
prostitutes, and other unprofessional behavior ranging from the
mundane--"depicting the boardroom as chaotic"--to the outrageous-
-depicting Koskoff "shaving a woman's head in the boardroom," for
which she received $10,000.   (App'x A to Pl.'s Interrogatory
Responses, Cox Decl. Ex. 15, Docket Entry 73-28, ECF pp. 11-12;
Suppl. Compl. ¶ 30; Def.s' 56.1 Stmt. ¶ 7; Memoir at 104.)

Generally, the complained-of scenes are dramatized
versions of events discussed in the Memoir.  For instance, the
Memoir describes drug use and prostitution activity in the
boardroom, (e.g., Memoir at 54); criminal activity, including the
arrest of Gary Kaminsky, the Chief Financial Officer of a Stratton
Oakmont client, (Memoir at 121, 137-48; Memoir Pt. 2 pp. 225-End,
Docket Entry 73-4 at 339), and Plaintiff's role in a transaction
arising out of the initial public offering of Steven Madden Ltd.-
-Steve Madden's well-known shoe company--for which Madden pled
guilty to money laundering, (Memoir at 415-19); and the immorality
at Stratton Oakmont, such as the head-shaving incident and a

discussion involving Plaintiff of whether to host a "[m]idget [t]ossing [c]ompetition," (Memoir at 64-67, 104-06).

While Koskoff and Plaintiff share certain traits, Koskoff was created as a "composite character" inspired by three individuals discussed in the Memoir, not as a carbon copy of Plaintiff. (Defs.' 56.1 Stmt. ¶¶ 73-74.) Specifically, Koskoff incorporates elements of Plaintiff, Elliott Loewenstern, and Gary Kaminsky, as Belfort portrayed them.[5] (Defs.' 56.1 Stmt. ¶ 74.) Loewenstern was Belfort's childhood friend and one of the first people to work at Stratton Oakmont as a retail cold-caller and broker. (Defs.' 56.1 Stmt. ¶ 75.) As discussed, Plaintiff is described in the Memoir as Belfort's childhood friend and is mocked for wearing a toupee. (Defs.' 56.1 Stmt. ¶ 75.) Kaminsky is portrayed as the toupee-wearing Chief Financial Officer of Dollar Time Corporation, a company that used Stratton Oakmont's corporate finance services. (Def.s' 56.1 Stmt. ¶ 75.) According to the Memoir, Kaminsky accompanied Belfort on a trip to Switzerland,

---

[5] Terrence Winter, who wrote the screenplay for the Movie, decided to combine these individuals into the Koskoff Character to conserve screen time and help avoid audience confusion. (Defs.' 56.1 Stmt. ¶ 74; Winter Decl., Docket Entry 73-67, ¶ 19.) According to Winter, Koskoff "needed to serve several functions, and since there were certain similarities among Loewenstern, [Plaintiff,] and Kaminsky, it became possible to create a composite fictional character inspired by those three people who would be helpful in my primary story-telling mission of telling [ ] Belfort's story from Belfort's point of view." (Winter Decl. ¶ 19.)

during which Belfort arranged a money-laundering scheme with a Swiss banker. (Defs.' 56.1 Stmt. ¶¶ 56, 75.) Additionally, the Memoir provides that Kaminsky was arrested in Florida with the Swiss banker. (Defs.' 56.1 Stmt. ¶ 75.)

Individuals who saw the Movie and who knew Plaintiff while he worked for Stratton Oakmont testified that they believed Koskoff was a depiction of Plaintiff because, like Plaintiff, he wore a toupee and was a lawyer involved in corporate finance at the firm. (Pl.'s 56.1 Counterstmt. ¶ 103.) Specifically, Howard Gelfand, a Stratton Oakmont employee, (Gelfand Dep., Cox Decl. Ex. 42, Docket Entry 73-51, 10:2-11:5), testified that he knew Koskoff referred to Plaintiff because "he was a corporate finance guy and he was wearing a toupee," (Gelfand Dep. 37:17-20). Neil Kaufman, a securities lawyer who worked on an initial public offering underwritten by Stratton Oakmont, (Kaufman Dep., Cox Decl. Ex. 46, Docket Entry 73-55, 13:18-25), testified that it was obvious that Koskoff was a portrayal of Plaintiff because they were both in-house lawyers at Stratton Oakmont with the similarly punned nicknames of "Rugrat" and "Wigwam," (Kaufman Dep. 50:17-51:5). Norman Arnoff, who represented Stratton Oakmont in connection with securities arbitrations and state regulatory matters, (Arnoff Dep., Cox Decl. Ex. 47, Docket Entry 73-56, 12:14-13:23), testified that he believed Koskoff identified Plaintiff because "[o]ne, [ ] the wig[, a]nd two[,] because of the involvement . . . in the

[initial public offerings] in the business aspect of Stratton in the [M]ovie," (Arnoff Dep. 61:9-18).  Ross Portenoy, who was friends with Plaintiff and Belfort and did printing work for Stratton Oakmont, (Portenoy Dep., Cox Decl. Ex. 48, Docket Entry 73-57, 10:13-15:10), testified that he believed Koskoff was Plaintiff because "the hairpiece, his nickname of Rugrat," and "his role in the [M]ovie was corporate finance and dealing with corporate finance," (Portenoy Dep. 45:5-15).  Stacy Rettinger, Plaintiff's ex-fiancée, (Rettinger Dep., Cox Decl. Ex. 49, Docket Entry 73-58, 34:7-21), testified that she thought "[t]he attorney with the . . . toupee and the glasses" was a depiction of Plaintiff, (Rettinger Dep. 31:20-25).

     Notably, each of these individuals also testified that they did not associate Plaintiff with the defamatory aspects of Koskoff.  (Defs.' 56.1 Stmt. ¶ 88.)  Gelfand testified that he did not believe that Koskoff's actions mirrored Plaintiff's, because while the typical Stratton Oakmont employee "was a drug monger, prostitute monger," Plaintiff "wasn't particularly that guy." (Gelfand Dep. 44:20-45:5; see also Gelfand Dep. 64:12-22.) According to Kaufman, "the depiction of [Koskoff] in the [Movie] was a . . . gross distortion of" Plaintiff.  (Kaufman Dep. 42:11-24.)  Arnoff testified that he recognized that not every character from the Movie "matche[d] somebody 100 percent," (Arnoff Dep. 62:3-6), and that while Koskoff resembled Plaintiff more than anyone

11

else at Stratton Oakmont, Koskoff was "an extreme caricature" of Plaintiff (Arnoff Dep. 51:13-21; see also Arnoff Dep. 51:22-52:12 ("There were similarities [between Koskoff and Plaintiff] . . . but I don't think it was identical.")). Plaintiff "was one of the good guys." (Arnoff Dep. 61:19-62:20.) Portenoy testified that he believed that Koskoff made a "mockery . . . of [Plaintiff] . . . [by] mak[ing him] look like a drug addict, partying and having sex with all these girls, doing the things he was doing in Stratton Oakmont, when I know for a fact that [Plaintiff] was the one that dealt with the regulations, that was trying to keep that firm going, and all of a sudden [Belfort] is mocking him, making him look like this character, and that is definitely not who [Plaintiff] was." (Portenoy Dep. 44:8-24; see Portenoy Dep. 90:12-17 ("[Plaintiff] was depicted as a character that absolutely did not--was not the [Plaintiff] that I knew that worked at Stratton Oakmont.").)  Finally, Rettinger testified that she did not recall anything about what Koskoff did in the Movie, but only that he was Belfort's sidekick.  (Rettinger Dep. 29:3-14.)

## PROCEDURAL HISTORY

Plaintiff commenced this action on February 18, 2014, asserting two causes of action for invasion of his privacy under New York Civil Rights Law § 51, one cause of action for invasion of his privacy under New York common law, and two causes of action

12

for libel per se--one alleging actual malice and the other alleging negligence.  Greene I, 138 F. Supp. 3d at 230-31, 236-37.

In the September 2015 Order, the Court dismissed Plaintiff's invasion of privacy claims with prejudice.  Id. at 237.  Additionally, the Court dismissed Plaintiff's negligence-based, private-figure libel claim without prejudice.  Greene I, 138 F. Supp. 3d at 236-37.  Plaintiff did not amend his Complaint to replead the claim, though the Court granted him leave to do so.  Id.; (see Oct. 17, 2015 Elec. Order.)  Thus, only his public-figure libel claim alleging actual malice remains.  (See Oct. 2015 Elec. Order.)

Defendants moved for summary judgment on February 5, 2018; Plaintiff opposed the motion on March 5, 2018, (Pl.'s Opp.); and Defendants filed a reply brief in further support of their motion on March 19, 2018.  (See Defs.' Br.; Pl.'s Opp.; and Defs.' Reply, Docket Entry 76.)

DISCUSSION

I.  <u>Legal Standard</u>

Summary judgment will be granted where the movant demonstrates that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine factual issue exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S.

13

242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed 2d 202 (1986).   In determining whether an award of summary judgment is appropriate, the Court considers the "pleadings, deposition testimony, answers to interrogatories and admissions on file, together with any other firsthand information including but not limited to affidavits." Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011).

The movant bears the burden of establishing that there are no genuine issues of material fact.   Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223 (2d Cir. 1994).   Once the movant makes such a showing, the non-movant must proffer specific facts demonstrating "a genuine issue for trial." Giglio v. Buonnadonna Shoprite LLC, No. 06-CV-5191, 2009 WL 3150431, at *4 (E.D.N.Y. Sept. 25, 2009) (internal quotation marks and citation omitted).   Conclusory allegations or denials will not defeat summary judgment.   Id.   However, in reviewing the summary judgment record, "'the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'"   Sheet Metal Workers' Nat'l Pension Fund v. Vadaris Tech. Inc., No. 13-CV-5286, 2015 WL 6449420, at *2 (E.D.N.Y. Oct. 23, 2015) (quoting McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997)).

II.   Defamation

"'The law of defamation serves to protect an individual's right to one's reputation.'"   Kavanagh v. Zwilling,

14

997 F. Supp. 2d 241, 248 (S.D.N.Y. 2014) (quoting Idema v. Wager,
120 F. Supp. 2d 361, 365 (S.D.N.Y. 2000)), aff'd, 578 F. App'x 24
(2d Cir. 2014).  Defamation is comprised of "'the twin torts of
libel and slander' . . . .  Spoken defamatory words are slander;
written defamatory words are libel." Colodney v. Continuum Health
Partners, Inc., No. 03-CV-7276, 2004 WL 829158, at *7 (S.D.N.Y.
Apr. 15, 2004) (quoting Albert v. Loksen, 239 F.3d 256, 265 (2d
Cir. 2001)).  To recover for libel under New York law, a plaintiff
must establish five elements: "(1) a written defamatory factual
statement [of and] concerning the plaintiff; (2) publication to a
third party; (3) fault; (4) falsity of the defamatory statement;
and (5) special damages or per se actionability." Chau v. Lewis,
771 F.3d 118, 126-27 (2d Cir. 2014) (citing Celle v. Filipino
Reporter Enters. Inc., 209 F.3d 163, 176 (2d Cir. 2000)).

   A.   Defendants' Motion

       Defendants argue that Plaintiff cannot recover because
(1) the portrayal of Koskoff is not "of and concerning" Plaintiff
(Defs.' Br. at 19-23); (2) even if Koskoff is a portrayal of
Plaintiff, that portrayal is substantially true (Defs.' Br. at 14-
18); (3) Defendants did not act with actual malice (Defs.' Br. at
8-13); (4) most alleged instances of libel per se are not
actionable (Defs.' Br. at 23-25); and (5) Plaintiff did not suffer
special damages (Defs.' Br. at 25).  Plaintiff contends that
(1) the Koskoff Character is "of and concerning" Plaintiff (Pl.'s

Opp. at 15-17); (2) Defendants acted with actual malice (Pl.'s Opp. at 10-15); (3) Plaintiff's claims are actionable per se (Pl.'s Opp. at 17-19); and (4) Plaintiff suffered special damages (Pl.'s Opp. at 19-20).

For the reasons that follow, even assuming there are issues of fact regarding whether the Koskoff Character is "of and concerning" Plaintiff, his libel claim fails because he has not introduced evidence that Defendants acted with actual malice in making false statements "of and concerning" him.

B.   Actual Malice

1.   Standards

The standard of fault required to find a defendant liable for defamation varies depending on the status of the plaintiff. As a federal constitutional matter, if the plaintiff is a "public figure," he "must demonstrate by clear and convincing evidence that the defendant acted with 'actual malice.'" Biro v. Conde Nast, 963 F. Supp. 2d 255, 276 (S.D.N.Y. 2013). As described above, Plaintiff elected not to pursue a private-figure defamation claim, leaving only his public-figure claim based on actual malice. Further, Plaintiff's opposition concedes his status as a public figure, and thus, the actual malice standard applies. (See Pl.'s Opp. at 10 ("Plaintiff can satisfy the requisite showing of 'actual malice' on the part of Defendants in this matter.").)

"[A]ctual malice does not simply connote ill will or spite; rather it is 'a term of art denoting deliberate or reckless falsification.'" <u>Biro</u>, 963 F. Supp. 2d at 276 (quoting <u>Masson v. New Yorker Magazine</u>, 501 U.S. 496, 499, 111 S. Ct. 2419, 2424, 115 L. Ed. 2d 447 (1991)) (citations omitted).  "[R]eckless disregard of truth" will be found where there is a "subjective awareness of probable falsity." <u>Gertz v. Robert Welch, Inc.</u>, 418 U.S. 323, 334 n.6, 94 S. Ct. 2997, 3004 n.6, 41 L. Ed. 2d 789 (1974) (citing <u>St. Amant v. Thompson</u>, 390 U.S. 727, 731, 88 S. Ct. 1323, 1325, 20 L. Ed. 2d 262 (1968) ("There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.")).  "Freedoms of expression require 'breathing space,'" and the actual malice requirement provides it by allowing "public figures to recover for libel or defamation only when they can prove <u>both</u> that the statement was false and that the statement was made with the requisite level of culpability.'" <u>Hustler Magazine, Inc. v. Falwell</u>, 485 U.S. 46, 52, 108 S. Ct. 876, 880, 99 L. Ed. 2d 41 (1988) (internal citations and quotation marks omitted).

In the context of a composite or fictional character, the actual malice inquiry is intertwined with whether there was a false statement "of and concerning" the plaintiff.  Here, for example, Defendants combined aspects of Plaintiff and others in creating the Koskoff Character:  Koskoff shared several of

17

Plaintiff's characteristics but engaged in actions carried out by others--for instance, Kaminsky's trip to Switzerland and arrest in Florida.  (Defs.' 56.1 Stmt. ¶ 75.)  Therefore, if Koskoff is "of and concerning" Plaintiff, then certain aspects of Koskoff are false as to Plaintiff, and Defendants acted with knowledge of that falsity.  If Koskoff is not "of and concerning" Plaintiff, however, then any statement about that character is not false, and thus, not knowingly false.  In other words, under a literal application of the test, actual malice is "automatic" if the character is "of and concerning" Plaintiff.  See New Times, Inc. v. Isaacks, 146 S.W.3d 144, 162 (Tex. 2004).

Courts have recognized a similar tangling of elements in the analogous contexts of satire and parody, where statements that appear to express facts are instead intended "as outrageous parodies or caricatures expressing an opinion."  See Dworkin v. Hustler Magazine Inc., 867 F.2d 1188, 1194 (9th Cir. 1989).  For instance, discussing actual malice in the parody context, the Ninth Circuit noted that "it might seem that inquiring into the existence of . . . malice is inconsistent with the conclusion that the [magazine f]eatures contain [opinions,] no[t] statements of fact." Id.  But the "apparent inconsistency" is reconciled since "'there is no consciousness that [the speaker] is publishing something false, because [the speaker doesn't] think [he's] publishing a statement of fact.'" Id. (alterations in original).  And because

knowing or reckless falsification is required to establish actual malice, "if a speaker knowingly publishes a literally untrue statement without holding the statement out as true, he may [ ] lack subjective knowledge or recklessness as to the falsification of a statement of fact required by New York Times." Id. at 1194-95.

Similarly, the Supreme Court of Texas noted that a literal application of the actual malice test in the satire context would result in "'automatic actual malice' . . . because the author always knows the publication contains false statements of fact." New Times, Inc., 146 S.W.3d at 162. Finding that such a rule would be incompatible with the First Amendment, it articulated the question of actual malice in satire cases as follows: "[D]id the publisher either know or have reckless disregard for whether the article could reasonably be interpreted as stating actual facts?" Id. at 162-63 (citations and footnote omitted).

The actual malice inquiry for fictional characters can likewise be reframed to avoid "automatic actual malice." As discussed, a statement will only be false if the character is found to be "of and concerning" the plaintiff. Thus, determining whether the defendant acted with knowledge or reckless disregard in making a false statement is dependent on whether the defendant acted with knowledge or reckless disregard in making a statement "of and concerning" the plaintiff through the portrayal of a fictional

19

character.  This inquiry collapses into whether the defendant knew or acted with reckless disregard for whether the portrayal of the character would be "of and concerning" the plaintiff.  See Rest. 2d of Torts § 564, cmt. f. ("The common law position was that if the recipient reasonably understood the communication to be made [of and] concerning the plaintiff, the defamer was subject to liability even though he was not at fault . . . .  This position is now held to be in violation of the First Amendment to the Constitution.  The Supreme Court holds that there must be intent [or] recklessness . . . on the part of the defamer.").

    2.  <u>Analysis</u>

    Defendants argue that there is no evidence that Red Granite, Paramount, or Appian Way acted with actual malice because they did not act with knowledge or reckless disregard for whether Koskoff would be perceived to be "of and concerning" Plaintiff. (Defs.' Br. at 8-13.)  In response, Plaintiff contends that Defendants acted with reckless disregard of falsity by (1) failing to properly research aspects of the Memoir, (2) relying on Belfort in their due-diligence efforts, when Belfort "has admitted to regularly and pathologically lying to customers, colleagues, law enforcement and Courts," (3) engaging in "limited research regarding portrayals of real-life incidents and individuals," (4) lacking knowledge about legal clearance procedures, and (5) being unconcerned with factual accuracy. (Pl.'s Opp. at 10-

15.)  However, Plaintiff ignores Defendants' argument that they did not act with knowledge or recklessness in portraying him in the first place.  And critically, while Defendants support their position with the evidence below, Plaintiff has not established a genuine issue of material fact by introducing or highlighting conflicting evidence.

Red Granite was the manager of TWOWS, LLC, the production company for the Movie.  (Defs.' 56.1 Stmt. ¶ 107.)  Christopher McFarland, a Producer and Vice Chairman of Red Granite, supervised the team that vetted the Movie to avoid violating third parties' reputational rights.  (McFarland Decl., Docket Entry 73-62, ¶¶ 2, 7, 16.)  McFarland explains that the Movie was "based upon events seen from the distinctive point of view of Jordan Belfort." (McFarland Decl. ¶ 3.)  To portray Belfort and the atmosphere of Stratton Oakmont, the Movie "had characters employed by Stratton Oakmont doing things similar to events that actually occurred, [though] no attempt was made to have any characters that would reasonably be understood as [ ] specific Stratton Oakmont employee[s]."  (McFarland Decl. ¶ 3.)  Specifically, McFarland provides that the Movie was "not intend[ed] to have any character that would reasonably be seen as the Plaintiff."  (McFarland Decl. ¶ 3.)  Further, he explains that he did not believe viewers would understand the Koskoff Character to refer to any specific or real person because (1) Koskoff was a composite character with a "made-

up name . . . and a job and personal history different from the people who helped to inspire the character," (2) the disclaimer in the Movie's credits explained that certain characters were fictionalized,[6] and (3) "the style and content of the [Movie]." (McFarland Decl. ¶¶ 6-7, 16.)  Finally, he provides that "[e]ven if someone mistakenly believed that Koskoff was not a composite fictional character, but instead was a depiction of a real person, it seemed to me that such a viewer would think that the real person's name was Koskoff."  (McFarland Decl. ¶ 16.)

Paramount acted solely as the Movie's distributor and did not produce or develop its screenplay.  (Defs.' 56.1 Stmt. ¶ 91.)  According to Lola Langner, Senior Vice President in Paramount's legal department, Paramount distributed the Movie based on: (1) "chain of title documents showing that the [Movie]

---

[6] In full, the disclaimer provides:

> While this story is based on actual events, certain characters, characterizations, incidents, locations and dialogue were fictionalized or invented for purposes of dramatization.  With respect to such fictionalization or invention, any similarity to the name or to the actual character or history of any person, living or dead, or any product or entity or actual incident, is entirely for dramatic purpose and not intended to reflect on an actual character, history, product or entity.

(Defs.' 56.1 Stmt. ¶ 90.)

was based upon an underlying non-fiction book"; (2) information from a Red Granite attorney that there had been no lawsuits brought against the Movie or Memoir, and that the only claim against the Movie or Memoir had come from an attorney representing Daniel Porush, Stratton Oakmont's former president; (3) an agreement pursuant to which the Movie's producer and copyright owner, TWOWS, LLC, represented and warranted to Paramount that the Movie would comply with libel and slander laws; and (4) assurances that TWOWS, LLC had "conducted a detailed analysis regarding the compliance of the [Movie] . . . with the laws pertaining to rights of . . . defamation." (Langner Decl., Docket Entry 73-59, ¶¶ 2-8; see Defs.' 56.1 Stmt. ¶ 11.)

Appian Way's involvement in the Movie included persuading Warner Brothers to acquire the underlying motion picture rights and assisting in the initial stages of development, which led to the commitment by Martin Scorsese's production company, Sikelia,[7] to furnish Scorsese's services. (Def.s' 56.1 Stmt. ¶ 101.) According to the declaration of Jennifer Davisson, head of production at Appian Way, the company's development work occurred in 2007 and 2008, when she and Leonardo DiCaprio met with Winter to discuss his "broad-stroke idea of how he would like to adapt [the Memoir] as a motion picture screenplay." (Davisson

---

[7] As discussed, Plaintiff's claims against Sikelia were dismissed in the September 2017 Order.

Decl., Docket Entry 73-70, ¶¶ 2, 8.)  After Scorsese agreed to become involved and Appian Way had provided comments on the first draft of the script in 2008, its direct involvement in the Movie's development ended.  (Davisson Decl. ¶ 8.)  The film project ceased to be actively developed in 2008, but in 2011, Davisson learned that Red Granite was willing to finance the project.  (Davisson Decl. ¶ 9.)  Thereafter, Appian Way furnished DiCaprio's acting services, while TWOWS, LLC and Sikelia took over the "hands-on" production of the Movie.  (Davisson Decl. ¶¶ 10-11.)  Davisson knows of no one at Appian Way who had any role in creating or developing any aspect of the Koskoff Character, and she believed that Appian Way had no right to determine the content of the Movie, "except insofar as it furnished the services of Leonardo DiCaprio as the lead actor performing the role of Jordan Belfort." (Davisson Decl. ¶¶ 11-12.)  She believed that vetting the Movie to ensure that it did not violate third parties' rights was under Sikelia's or TWOWS, LLC's control, and that Appian Way played no role in that process.  (Davisson Decl. ¶ 13.)  Finally, Davisson provides that (1) she understood that the Movie "did not say anything that was false about any real persons," (2) she knew of no pending defamation claims with respect to the Movie, (3) she had no belief that anyone would be defamed by the Movie, and (4) she "believed that the [Koskoff C]haracter was a fictional

character inspired by several people in the [Memoir]." (Davisson Decl. ¶ 13.)

In light of the above, even if Koskoff is a depiction of Plaintiff, the Court concludes that Defendants did not act with knowledge or reckless disregard for whether Koskoff was "of and concerning" Plaintiff, and thus, that they did not act with actual malice. Specifically, based on (1) the fictionalized nature of the Movie; (2) the undisputed facts that the Koskoff Character is a composite of three people and has a different name, nickname, employment history, personal history, and criminal history than Plaintiff; (3) the Movie's disclaimer; (4) evidence of each Defendant's subjective understanding that no real person was portrayed--or defamed--by the Koskoff Character; and (5) the lack of evidence to the contrary, Plaintiff cannot establish that Defendants "in fact entertained serious doubts as to the truth of [the] publication." See St. Amant, 390 U.S. at 731, 88 S. Ct. at 1325. Accordingly, Plaintiff cannot carry his burden of demonstrating actual malice with clear and convincing evidence, and his libel claim fails.

[BOTTOM OF PAGE INTENTIONALLY LEFT BLANK]

<u>CONCLUSION</u>

For the foregoing reasons, Defendants' summary judgment motion (Docket Entry 73) is GRANTED and Plaintiff's libel claim is DISMISSED WITH PREJUDICE.  The Clerk of the Court is directed to enter judgment accordingly and mark this case CLOSED.


SO ORDERED.


/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:     December   13   , 2018
           Central Islip, New York